ADELINE AHUNA, et al., Plaintiffs-Appellees, *v.* DEPARTMENT OF HAWAIIAN HOME LANDS OF THE STATE OF HAWAII, Defendant-Appellant

NO. 6420

CIVIL NO. 2290

FEBRUARY 17, 1982

RICHARDSON, C.J., LUM, NAKAMURA, JJ.,
RETIRED JUSTICE OGATA, ASSIGNED BY REASON
OF VACANCY, AND CIRCUIT JUDGE FONG
IN PLACE OF MENOR, J., DISQUALIFIED

OPINION OF THE COURT BY RICHARDSON, C. J.

This appeal seeks to determine whether an order filed on September 14, 1976, by Judge Kubota in the circuit court of the Third Circuit properly implemented a prior order filed on February 5, 1971 in the same case.[1] Defendant-appellant Department of Ha-

---

[1] The prior order was issued by Judge Menor who was appointed to the Hawaii Supreme Court in 1974. Justice Menor has disqualified himself in this appeal.

waiiah Home Lands specifically appeals from that portion of the 1976 order directing it, *inter alia,* to issue a lease to plaintiff-appellee Wallace Beck of the full ten acres in Lot 92 situated in the Panaewa Hawaiian homestead area on the island of Hawaii. Appellant con-.tends it has complied fully with the 1971 order by awarding appellee a lease to approximately 6.5 acres of Lot 92. After examining the record and reviewing relevant legal and equitable precepts, we affirm the judgment of the court below because the prior order implicitly directed appellant to issue a lease to a ten-acre lot as close to appellee's present lot as possible or to show cause why such a lot could not be issued. Appellant neither issued such a lease nor adequately demonstrated why it was not possible to do so.

I.

A.

This action was initially filed on August 13, 1970, by a number of native Hawaiians[2] who were qualified under the Hawaiian Homes Commission Act, 1920, as amended, (hereafter HHCA)[3] to lease Hawaiian home lands for agricultural purposes at Panaewa, Hawaii. The action generally sought review under the Hawaii Administrative Procedure Act and a declaratory judgment that the policy of the Department of awarding agricultural lots at Panaewa on a permissive use basis contravened the HHCA and that the Department was obligated to issue leases to available agricultural tracts to all native Hawaiian applicants who were qualified to perform the conditions of the lease. The trial court dismissed the class action aspect of the complaint and the action was heard as an action on behalf of the named plaintiffs (appellee Beck being one of these named persons).

---

[2] Section 201 of the Hawaiian Homes Commission Act defines "native Hawaiian" as "any descendant of not less than one-half part of the blood of the races inhabiting the Hawaiian Islands previous to 1778."

[3] Hawaiian Homes Commission Act, 1920; Act of July 9, 1921, c. 42, 42 Stat. 108, *reprinted in* 1 Haw. Rev. Stat. 146 (1976).

On February 5, 1971, Judge Menor issued a Decision and Order finding the use permit system practiced by appellant in violation of the HHCA.[4] In addition, the court fashioned specific relief for each of the plaintiffs in the order. In most cases, appellant was instructed either to award a lease of a specific lot to the individual plaintiff [5] or to act upon the lease application of the plaintiff and explain any rejection of that application to the court.[6] The court thus retained

---

[4] With respect to the permissive use system, Judge Menor stated in his February 5, 1971 Order:

The use permit system apparently came about because of the high incidence of leasehold failures, not necessarily confined to the Panaewa Farm Lots subdivision. In this connection, the Court finds specifically that the Department was acting in good faith. The basic rationale of the system seems to be that the prospective leaseholder should first have to show the Department that he can in practice comply with the conditions of the lease before the lease is actually issued to him. While such a practice may have its merits, especially in view of the unwritten policy of the department to revoke a use permit only where a use permittee has absolutely done nothing towards improving and cultivating the premises after an extended period of time, and in the light of the tendency of younger generations of native Hawaiians (as well as other younger generations of Americans for that matter) to avoid farm work as much as possible, such a practice nevertheless is in conflict with the express provision of Section 205 that "Available lands shall be sold or leased only ... in the manner ... set out [in the Act]." There may conceivably be situations where by agreement of the parties a use permit may be authorized, but where, as here, a lease is applied for it shall, if granted, be for a term of ninety-nine years (Section 208), subject, always to cancellation or revocation before the expiration of the term, upon such grounds as are in the Act specified.

[5] For example, the court ordered:

3. That Defendant Department of Hawaiian Home Lands issue to Plaintiff ADELINE AHUNA a lease to Lot 150 upon essentially the terms and conditions contained in the standard lease form of the defendant (Exhibit 3). . . .

5. That Defendant Department of Hawaiian Home Lands issue to Plaintiff JOHN MANUIA a lease to Lot 180, or show cause why the same should not be issued.

6. That Defendant Department of Hawaiian Home Lands issue to Plaintiff ELEANOR RESPICIO a lease to Lot 144, or show cause why the same should not be issued.

[6] For instance, the court stated as follows:

7. That Defendant Department of Hawaiian Home Lands, within a reasonable time from the date hereof, act upon the application of GENESIS LEE LOY for a lease to Lot 115, and in the event of rejection to report to this Court in writing its specific reasons therefor.

8. That Defendant Department of Hawaiian Home Lands, within a reasonable time from the date hereof, act upon the application of AGNES AUWAE for a

jurisdiction to insure the proper implementation of its Decision and Order.

The claims of all plaintiffs except appellee Beck have been resolved and are not at issue on appeal. As to appellee, the order by Judge Menor provided that the Department issue "a lease to a lot situate as close to Lot 91 as possible, or show cause why the same should not be issued."

### B.

Appellee desired a lease to an additional lot adjoining his Lot 91. The court found appellee particularly interested in lots that were then zoned for industrial use.[7]

Appellant attempted several times to satisfy the 1971 order by offering appellee lots outside the area zoned industrial. In February of 1972, appellee requested a lease to Lot 92 which was adjacent to his present Lot 91 and zoned industrial. Appellant, however, was reluctant to award leases to lots within an industrial zone because those lots could be used for general leasing purposes. General lease revenues contributed significantly to the Department's budget.

In early 1973, appellant petitioned the County of Hawaii to rezone Panaewa farm Lots 91-97 from industrial to agricultural use; in December 1974, the County rezoned Lots 91 and 92 for agricultural use. Subsequently, in January of 1975, appellant informed

------

lease to Lot 183, and in the event of rejection to report to this Court in writing its specific reasons therefor.

9. That Defendant Department of Hawaiian Home Lands, within a reasonable time from the date hereof, act upon the application of JOYCE KELEKOLIO for a lease to Lot 108, and in the event of rejection to report to this Court in writing its specific reasons therefor.

10. That Defendant Department of Hawaiian Home Lands, within a reasonable time from the date hereof, act upon the application of ELIZABETH AKIM-SEU for a lease to Lot 105, and in the event of rejection to report to this Court in writing its specific reasons therefor.

[7] At the outset of the case, appellee expressed interest in Lots 90, 92, 46, 47 and 48 where they were zoned industrial. These lots adjoined appellee's property, Lot 91, and consisted of 10 acres each.

appellee Beck of the rezoning. Appellee believed this notice of the zoning change represented an assent to his request for Lot 92 and began to make improvements thereon.[8]

In the meantime, at a meeting in mid-1975, appellant considered the County's construction of the Puainako Road Extension (herein Extension), a proposed highway to be developed across Hawaiian home lands. Appellant approved the Extension in concept but reserved the right of final approval upon review of a detailed design thereof. Commission Minutes, May 30, 1975. As planned, the Extension was to occupy about 3.5 acres of Lot 92. Appellant subsequently decided to award approximately 6.5 acres of Lot 92 to appellee and to retain approximately 3.5 acres because the parcel would be affected by the proposed Extension.

The question of whether appellee was entitled to the full ten acres of Lot 92 was then brought before Judge Kubota in the Third Circuit. Judge Kubota generally concluded that appellant had a fiduciary obligation to place beneficiaries of HHCA such as appellee on the land to the fullest extent possible, that appellant failed to show good cause why appellee should not be awarded the full ten acres of Lot 92, and that appellant abused its discretion by excluding 3.5 acres of Lot 92 from the lease.

Consequently, the court ordered appellant to issue appellee a lease of the full ten acres of Lot 92, basically upon the same terms contained in appellant's standard lease form. The court, however, further ordered that such lease include a cancellation clause for the portion of Lot 92 subject to use for the construction of the proposed Extension, as well as provisions for the compensation of appellee upon condemnation and for relocation expenses.

## II.

Our analysis first addresses procedural matters. Appellant contends that there was no basis for a private right of action against the Department of Hawaiian Home Lands to enforce the trust obliga-

---

[8] The fact that appellee began to make improvements on Lot 92 upon hearing of it being rezoned, but before he was properly authorized to possess that lot, has no impact on this case.

tions imposed by the Hawaiian Homes Commission Act.[9]

The question of whether a private action may be properly brought under the circumstances of the case is generally not considered under subject matter jurisdiction, and is not of the jurisdictional sort which the court raises on its own motion. *Mt. Healthy City Board of Education v. Doyle,* 429 U.S. 274, 278-79 (1977); *Bell v. Hood,* 327 U.S. 678 (1946); *Haldorson v. Blair,* 449 F. Supp. 1025 (D. Minn. 1978). Since the question was raised by appellant for the first time on appeal, the issue was not properly brought before us and we do not express an opinion on that issue.

We now consider the substantive issues on appeal. The first question we examine concerns the intent of Judge Menor's order with respect to appellee Beck. Only after we have grasped the contemplation of the court can we decide whether Judge Kubota properly implemented its order.

It is well settled that a judgment or decree, like any other written instrument, should be construed reasonably and as a whole so as to give effect to the intention of the court. *Smith v. Smith,* 56 Haw. 295, 535 P.2d 1109 (1975); *see also Lopez v. Lopez,* 125 Ariz. 309, 609 P.2d 579 (1980); *Callan v. Callan,* 2 Wash. App. 446, 468 P.2d 456 (1970). Moreover, we must give effect not only to that which is expressed but also to that which is unavoidably and necessarily implied by the

---

[9] Appellant also asserts that the original claim was precluded by the doctrine of sovereign immunity. Since the original order issued by Judge Menor was final and appealable and that order was not appealed, the sovereign immunity issue may constitute a collateral attack on the order. The applicability of the doctrine of sovereign immunity has been considered an element of subject matter jurisdiction. *See* Marks v. Ah Nee, 48 Haw. 92, 94-95, 395 P.2d 620, 621-22 (1964); 5 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1350 (Supp. 1980). In dealing with collateral attack on the basis of lack of subject matter jurisdiction, the modern rule gives finality substantially greater weight than validity, and treats the original judgment as valid on the basis of res judicata. Restatement (Second) of Judgments § 15 (Tent. Draft No. 6, 1979).

In the instant case, the issue of subject matter jurisdiction has been implicitly resolved through the decision and order on the merits. Since none of the exceptions to the general rule of finality of jurisdictional determinations are met, *see* Restatement (Second) of Judgments § 15, *supra,* appellant is precluded from litigating the question of the court's subject matter jurisdiction. *See* Jackson *ex rel.* United States v. Irving Trust Co., 311 U.S. 494 (1941).

judgment or decree. *Anderson v. Anderson,* 59 Haw. 575, 585 P.2d 938 (1978); *Pope v. Pope,* 7 Ill. App.3d 935, 289 N.E.2d 9 (1972).

With respect to appellee's desire to attain a lease to a lot adjoining his present lot, Judge Menor ordered "[t]hat Defendant Department of Hawaiian Home Lands issue to Plaintiff WALLACE BECK a lease to a lot as close to Lot 91 as possible, or show cause why the same should not be issued." The foregoing directive appears ambiguous in two respects. First, it is not clear whether the phrase "a lease to a lot" meant a ten-acre lot or a lot of any size; second, what would constitute cause for appellant not to issue a lease as directed is not articulated.

### A.

As to the size of the farm lot intended by the court in its 1971 order, we think it contemplated a lot of the size of lots in the relevant area at the time of the order. In short, we find that Judge Menor meant a ten-acre lot when he instructed appellant to issue "a lot" as close as possible to Lot 91. Our analysis of the order in its entirety leads us to this conclusion.

First, we note the court fashioned specific relief for each individual plaintiff in the action. For example, one plaintiff Adeline Ahuna applied for a lease to Lot 150; the court ordered an issuance of that lease. Plaintiff John Manuia requested a lease to Lot 180; the court again ordered an issuance of a lease to that lot. There are other similar examples. No single directive specified the size of the lot. We believe such a designation was unnecessary because it is clear from the decision and order that the court meant the size of the lots as they existed, not a fraction thereof. The trial court's decision stated in part:

> The *Panaewa Farm Lots* are situated at Waiakea, South Hilo, County and State of Hawaii, and *consists of approximately 186 lots, ranging in size from three to ten acres.* The great majority are in the 10-acre category. The lease or occupation of these lots, for farming purposes, have been limited to leaseholders at Keaukaha, who did not have to rely exclusively, or even primarily, on farming as a source of livelihood in order to qualify.

(Emphasis added). The court evidently meant to provide relief for plaintiffs within the context of the general scheme of the Panaewa

homestead area. Any one of these lots could be specifically identified in terms of acreages and exact location by lot number. The language of the order does not give rise to a conclusion that appellee was to be afforded relief inconsistent therewith.

Second, the 1971 court found appellee was interested in specific lots adjoining his property (*to wit,* Lots 90, 92, 46, 47, and 48), albeit they were zoned industrial. These lots consisted of ten acres. There is nothing in the order from which it may be concluded that appellee should be treated differently from other plaintiffs and receive less than a full lot. Moreover, because all the lots surrounding appellee's property, even those lots outside the area zoned for industrial use, consisted of ten acres, it would be reasonable to find the court intended that appellee be issued the acreage requested.

Appellant, however, contends that the court's order neither contained a directive to award appellee a specific lot nor expressly mandated that the lot awarded must comprise a certain acreage. And we agree. Viewed in a vacuum, we could construe the particular order involving appellee narrowly in the manner appellant contends it should be. But we are obliged to examine the entire decision and order of the court in arriving at a reasonable conclusion. And while we also agree that appellant was vested with some discretion by the court's order, we believe that this discretion was limited to the proximity of the awarded lot to Lot 91, not the size of that lot. Hence, we hold that Judge Menor intended in the 1971 Order that appellant issue appellee a lease to a ten-acre farm lot as close to Lot 91 as possible.

However, the court also afforded appellant an opportunity to demonstrate why it could not issue such a lease, if it decided not to. Our next inquiry, therefore, is whether there was sufficient cause for appellant not to issue a lease to a ten-acre parcel of land.

### B.

In awarding appellee 6.5 plus or minus acres of Lot 92, appellant failed to comply with the order to award appellee a lot as directed, but it nevertheless may justify the award if it can. But before we can address this question, we must first determine the extent of the burden imposed on appellant by the show cause provision.

It is generally acknowledged that the primary purpose of the HHCA was the rehabilitation of native Hawaiians. Senator John H. Wise, a member of the "Legislative Commission of the Territory [of Hawaii]," and one of the authors of the HHCA, described the law as a plan for the rehabilitation of the Hawaiian people.[10] In *In re Ainoa,* 60 Haw. 487, 591 P.2d 607 (1979), we recognized the purpose of the HHCA was to rehabilitate the native Hawaiians on lands given the status of Hawaiian home lands under section 204 of the HHCA. We further emphasized there that "[the] native Hawaiians are special objects of solicitude under the Act." 60 Haw. at 488, 591 P.2d at 608. This language indicates that we are aware of a high duty of care owed to native Hawaiians.

The legislative history at the inception of the HHCA strongly suggests that the federal government stood in a trusteeship capacity to the aboriginal people. Ex-Secretary of Interior Franklin K. Lane testified before the House Committee on the Territories:

> One thing that impressed me . . . was the fact that the natives of the islands who are our *wards,* I should say, and *for whom in a sense we are trustees,* are falling off rapidly in numbers and many of them are in poverty. They never owned the lands of the islands. The land was owned by the King originally, . . .

H. R. Rep. No. 839, 66th Cong., 2d Sess. 4 (1920) (emphasis added). The term "ward" connotes a notion of trusteeship. *See generally Cherokee Nation v. Georgia,* 30 U.S. (5 Pet.) 1 (1831). The Committee on the Territories described in part the general policy underlying the bill for the enactment of the HHCA in these words:

> Your committee is . . . of the opinion that (1) the Hawaiian must

---

[10] Senator Wise specifically stated:

The idea in trying to get the lands back to some of the Hawaiians is to rehabilitate them. I believe that we should get them on lands and let them own their own homes. I believe it would be easy to rehabilitate them. The people of New Zealand are increasing today because they have the lands to live on and are working out their own salvation." . . . The Hawaiian people are a farming people and fishermen, out of door people, and when they were frozen out of their lands and driven into the cities they had to live in the cheapest places, tenements. That is one of the reasons why the Hawaiian people are dying. Now, the only way to save the, I contend, is to take them back to the lands and give them the mode of living that their ancestors were accustomed to and in that way rehabilitate them."

H.R. Rep. No. 839, 66th Cong., 2d Sess. 4 (1920).

be placed upon the land in order to insure his rehabilitation; (2) alienation of such land must, not only in the immediate future but also for many years to come, be made possible; (3) accessible water in adequate amounts must be provided for all tracts; (4) the Hawaiian must be financially aided until his farming operations are well underway. In framing such a program your committee is in a general way following the broad outlines of Senator Wise's plan.

H. R. Rep. No. 839, 66th Cong., 2d Sess. 4 (1920). The tenor of the foregoing statement by the committee also implies an intent to establish a trust relationship between the government and Hawaiian persons.

The federal government ultimately responded to the plight of the native Hawaiians and enacted the HHCA, placing over 200,000 acres of land for the use and benefit of the native people under the aegis of the Hawaiian Homes Commission. *See generally* Levy, *Native Hawaiian Land Rights*, 63 Cal. L. Rev. 848 (1975).

Finally, when we attained statehood in 1959, the State of Hawaii entered a compact with the United States to assume the management and disposition of the Hawaiian home lands and to adopt the HHCA as a provision of the State Constitution. Admission Act of March 18, 1959, Pub. L. No. 86-3, § 4, 73 Stat. 4, *reprinted in* 1 Haw. Rev. Stat. 78 (1976).[11] The State and its people reaffirmed this compact by adding another provision to the Constitution whereby they accepted specific trust obligations relating to the management of the Hawaiian home lands imposed by the federal government. The specific provision reads:

> *Section 2.* The State and its people do hereby accept, as a compact with the United States, or as conditions or trust provi-

---

[11] Section 4 of the Act reads in part:
  As a compact with the United States relating to the management and disposition of Hawaiian home lands, the Hawaiian Homes Commission Act, . . . shall be adopted as a provision of the Constitution of said State, . . .
  We recognize that "any amendment to increase the benefits to lessees of Hawaiian home lands may be made in the constitution, or in the manner required for State legislation, but the qualifications of lessees shall not be changed except with the consent of the United States." *Id.* This opinion in no way detracts from the authority of the foregoing provision.

sions imposed by the United States, relating to the management and disposition of the Hawaiian home lands, . . . the State and its people do further agree and declare *that the spirit of the Hawaiian Homes Commission Act looking to the continuance of the Hawaiian home projects for the further rehabilitation of the Hawaiian race shall be faithfully carried out.*

Hawaii Const. art. XI, § 2 (1959, renumbered art. XII, § 2, 1978) (emphasis added).

Thus from our review of the evolution of the HHCA and its impact on native Hawaiians, we conclude (1) that the federal government set aside certain public lands to be considered Hawaiian home lands to be utilized in the rehabilitation of native Hawaiians, thereby undertaking a trust obligation benefiting the aboriginal people; and (2) that the State of Hawaii assumed this fiduciary obligation upon being admitted into the Union as a state.

The Department of Hawaiian Home Lands, headed by the Hawaiian Homes Commission, received exclusive control of the Hawaiian home lands by section 204 of the HHCA. The HHCA further stated: "The powers and duties of the governor and the board of land and natural resources, in respect to lands of the State, shall not extend to lands having the status of Hawaiian home lands, except as specifically provided in this title." HHCA, § 206. We conclude from this history that the Hawaiian Homes Commission, which oversees the Department, is the specific state entity obliged to implement the fiduciary duty under the HHCA on behalf of eligible native Hawaiians. In dealing with eligible native Hawaiians collectively or individually, appellant must adhere to high fiduciary duties normally owed by a trustee to its beneficiaries. In light of the foregoing, we conclude that with respect to Judge Menor's order, the standard of conduct expected of appellant thereby was that befitting a trustee.

III.

Having determined there was a fiduciary duty owing appellee, we now consider whether there was a breach of such duty when appellant awarded appellee Beck only 6.5 plus or minus acres, or a fraction, of Lot 92.

## A.

In our opinion, the extent or nature of the trust obligations of the appellant toward beneficiaries such as the appellee may be determined by examining well-settled principles enunciated by the federal courts regarding lands set aside by Congress in trust for the benefit of other native Americans, *i.e.,* American Indians, Eskimos, and Alaska natives. In *Pence v. Kleppe,* 529 F.2d 135 (9th Cir. 1976), the circuit court recognized that the word "Indian" is commonly used in the United States to mean "the aborigines of America." *Id.* at 138-39 n.5; *see also* 42 C.J.S. *Indians* § 1 (1944). Congress recently passed a religious freedom act which specifically included native Hawaiians among other American Indians. *See* American Indian Religious Freedom Act, Pub. L. No. 95-341, 92 Stat. 469 (1978) (codified at 42 U.S.C. § 1996 (Supp. III 1979 )). Essentially, we are dealing with relationships between the government and aboriginal people. Reason thus dictates that we draw the analogy between native Hawaiian homesteaders and other native Americans.

In *Seminole Nation v. United States,* 316 U.S. 286 (1942), the United States Supreme Court described the scope of relevant fiduciary duties in these words:

> Under a humane and self imposed policy which has found expression in many acts of Congress and numerous decisions of this Court, [the Government] *has charged itself with moral obligations of the highest responsibility and trust.* Its conduct, as disclosed in the acts of those who represent it in dealings with the Indians, should therefore be judged by *the most exacting fiduciary standards.*

*Id.* at 296-97; *Accord, Worcester v. Georgia,* 31 U.S. (6 Pet.) 515 (1832); *Navajo Tribe of Indians v. United States,* 364 F.2d 320 (Ct. Cl. 1966) (emphasis added). The use of the term "most exacting fiduciary standards" imports the notion that the court will strictly scrutinize the actions of government.

The Supreme Court further supported this notion in ruling the conduct of the government as trustee is measured by the same strict standards applicable to private trustees. *United States v. Mason,* 412 U.S. 391 (1973); *accord, Manchester Band of Pomo Indians v. United States,* 363 F. Supp. 1238 (N.D. Cal. 1973), *Menominee Tribe of Indians v. United States,* 59 F. Supp. 137 (Ct. Cl. 1945).

One specific trust duty is the obligation to administer the trust solely in the interest of the beneficiary. *NLRB v. Amax Coal Co.*, 101 S. Ct. 2789 (1981). *See Manchester Band of Pomo Indians, supra; see generally Societa Operaia Di Mutuo Soccorso Villalba v. DiMaria,* 40 N.J. Super. 344, 122 A.2d 897 (1956); *In re Estate of Comerford,* 388 Pa. 278, 130 A.2d 458 (1957); Restatement (Second) of Trusts § 170 (1959); G. Bogert, Trusts and Trustees § 543 (rev. 2d ed. 1978).

A second fundamental trust obligation is to use reasonable skill and care to make trust property productive, *Manchester Band of Pomo Indians, supra,* or simply to act as an ordinary and prudent person would in dealing with his own property. *Id.; Richards v. Midkiff,* 48 Haw. 32, 396 P.2d 49 (1964); *Rippey v. Denver U.S. National Bank,* 273 F. Supp. 718 (D. Colo. 1967). We understand that a trustee is not expected to be infallible in his judgments or decisions. *Hartmann v. Bertelmann,* 39 Haw. 619 (1952). On the other hand, the reasonable prudent person standard applies to protecting and caring for the property and does not permit one to prudently speculate for instance. *Rippey v. Denver U.S. National Bank, supra* at 735.

Given these two basic duties of a trustee, we now impose them on the Hawaiian Homes Commission, the individual commissioners, and the Department to determine whether there has been a breach of fiduciary duties.

### B.

Considering all the circumstances surrounding the alleged breach of trust by the appellant, we are of an opinion that the actions of the trustees were unreasonable in this instance.

As to the question of the trustees considering the interests of third parties, or non-beneficiaries, we think it impermissibly weighed the interests of certain third parties in withholding a portion of Lot 92.

The appellant argues that the trustee must deal impartially when there is more than one beneficiary, citing Restatement (Second) of Trust § 183 (1959). We wholeheartedly concur. The trustees, however, have failed to sufficiently demonstrate that they considered the interests of all beneficiaries.

In testifying about the factors that the Commission considered in

withholding the acreage from Lot 92, former Chairperson Billy Beamer testified:

> In viewing the Puainako Extension, *which is a benefit to all of the citizens of Hawaii,* and primarily, those on the Island of Hawaii, it is our responsibility, to look at the pluses and the minuses.
>
> And as to how much it is going *to cost the State* to detour or to deviate, versus the loss to the Hawaiian homestead land, or to the homesteader.
>
> In this instance, the decision was delayed, and we deliberated.
>
> The Commission approved of the Puainako Extension. And *our first consideration was the number of people that it would benefit* versus the inconvenience that it might cause, to a few.
>
> And could these inconveniences be countermanded or buffered or mitigated, by other kind [sic] of provisions.
>
> *Number two, the costs, which should be number one, to the taxpayer,* in detouring the road. And in this discussion, then, if we had committed to the County, a right of entry. And committed, in fact, and approved of the alignment, as proposed to the Department, it would be a lefthanded gift, to say to them that we approve of this alignment, and then, on the next hand, to award a lot that would cause them, unnecessary expense, to the taxpayer, by having to withdraw that lot, later, after improvements have been made.
>
> But we could avoid this expense, if we would eliminate that portion of the land, that may be effected.

(Trans. Vol. III., pp. 30-31) (emphasis added). This language clearly illustrates the consideration given by the trustees to the State and its taxpayers. Chairperson Beamer's statement fails to show that the commissioners considered the interests of the other native beneficiaries. The primary concern of the Commission, however, must be the administration of the HHCA on behalf of those eligible native Hawaiian beneficiaries.

Appellant contends that the Commission did indeed consider the interests of the Hawaiian beneficiaries, referring to the Commission Minutes of May 30, 1975, which reflect the Department Plan-

ning Director presented a study of the proposed Extension.[12] The minutes indicate that the Extension would serve as the primary entrance to a future airport and that it would serve as a buffer between residential and industrial areas. One commissioner submitted that the people in the area were opposed to the highway. The report was then accepted by the Commission.

Other than accepting the study by the planning director, the May 30 minutes fail to show any deliberation by the commissioners on the study or any agreement or disagreement therewith by the commissioners. We can reasonably conclude that the Commission merely accepted the director's study for further consideration. The fact that the Commission later approved the road project only in concept, withholding final approval pending further study, suggests that it was not in complete agreement with the study.

Thus we believe the Commission's considerations, as illustrated by the record, gave undue weight to the interests of the State, the County of Hawaii and the citizens or taxpayers of Hawaii in general. This being the case, we rule the commissioners breached their fiduciary duty to eligible native Hawaiian beneficiaries collectively and individually, *to wit,* appellee Wallace Beck, and that they violated the trust obligations imposed by the Hawaii Constitution.

---

[12] The Commission minutes were transcribed as follows:

1. Puainako Extension

The Planning Director made a study of the roadway linking the proposed Kapoho-Keaukaha Highway, proposed airport expansion, Kanoelehua Avenue and the Saddle Road. It will serve as the primary entrance to the future airport.
The extension will benefit the Hawaiian Home Lands by:
    1. Improved access for long range development of proposed residential and industrial areas.
    2. Improved development potential for Kings Landing area — whether Department of Hawaiian Home Lands converts or exchanges.
    3. Providing a needed "buffer" between the industrial and residential areas.
    These benefits can be derived without financial participation by the Department of Hawaiian Home Lands.
Commissioner Napeahi submitted that the people still oppose the extension.
Letter from Ann Nathaniel to Mr. Chris Cobb was read against the roadway.
Commissioner Kauahikaua moved to accept the report of the Planning Director. Seconded by Commissioner Kaupiko and carried.
Commissioner Kauahikaua moved to approve the project in concept, but reserved the right to final approval subject to the detailed design. Seconded by Commissioner Moikeha and carried.

## C.

The final question we address relating to the breach of fiduciary duties is whether the commissioners acted as ordinary and prudent persons would in dealing with their own property when they decided to withhold the 3.5 acres in question. As far as we are able to determine from the record, the construction of the proposed Puainako Extension is speculative; it may never be built. To withhold the subject acreage because the project may eventually transect that land is a breach of the prudent person standard or the duty to use reasonable skill and care to make the trust property productive. For instance, Chairperson Beamer affirmed that the Extension was simply a possibility which might occur at some indefinite date. This affirmation took place about four months after the Commission had decided to withhold the 3.5 acres. In addition, Commissioner Kanahikawa emphasized the uncertainty of the road even being built. At a July, 1975 Commission meeting, he stated:

> Do we know when the road will be built? There is a possibility that it may never be built. We should award him the ten acres. In the event the highway is built, he will lose whatever acreage is involved.

At the same meeting, another commissioner asserted "[t]he County has assured that they would not go through any farm lots." Finally, Judge Kubota found the proposed highway as yet in the planning stage without a definite timetable for construction. We concur in his finding that the Extension was a "highly speculative" proposition.

We conclude that it would be unreasonable for a prudent landowner to leave almost four acres of agricultural land in an unproductive state because of a mere possibility that it may be subject to being used in the extension of a highway, some time in the indefinite future. We further believe that the award of Lot 92 without diminution would not impede or prevent the construction of the extension. Therefore we conclude that the commissioners also breached their duty of loyalty under this standard.

## IV.

Judge Kubota ruled that appellant is a trustee charged with

executing the trust created under the HHCA; that appellant failed its trust responsibility in withholding 3.5 plus or minus acres from appellee Beck; and that, therefore, appellant failed to show good cause why the appellee should not receive the full ten acres on Lot 92. We find that the record and the applicable trust principles support the lower court's determination.

The court then ordered appellant to issue to appellee Beck a lease to the full ten acres on Lot 92 under the standard form lease of the Department. The only exception in the lease would be a

clause allowing the cancellation of said lease for such portion of Lot 92 as is needed for construction of the proposed Puainako Extension provided that Plaintiff Beck is relocated to another Panaewa Farm Lot of comparable area to that taken by the roadway and provided that Plaintiff Beck is compensated for his relocation expenses and for improvements made on any portion of Lot 92 taken for the Puainako Extension.

The clause adequately provides for the contingency that trustees, consistent with their fiduciary duties, some day would find construction of the road in the best interests of the beneficiaries and at the same time sufficiently protects the interests of Plaintiff Beck. Any Department negotiations precedent to use of any portion of the lot for the proposed Puainako Extension therefore would take cognizance of the lease cancellation costs and could ensure that the expense of relocation and compensation for improvements be exported to the road project rather than be borne by the Department.

Accordingly, we uphold Judge Kubota's implementation of Judge Menor's 1971 Order in every respect.

Affirmed.

*George K. K. Kaeo, Jr., (Thomas E. Cook* with him on the opening brief), Deputy Attorneys General, for defendant-appellant.

*Ben H. Gaddis,* Legal Aid Society, and *Andrew C. Levin* for plaintiffs-appellees.