WILLIAM KALAEMAKANI AHIA, JR., LILY A. AHIA, SAMUEL KEOLA KALUNA, JR., WINIFRED PELE HANOA, and NOA EMMETT ALULI, Plaintiffs-Appellants, *v.* DEPARTMENT OF TRANSPORTATION; WAYNE YAMASAKI, in his capacity as Director of the Department of Transportation; DEPARTMENT OF HAWAIIAN HOME LANDS; GEORGIANA K. PADEKEN, in her capacity as Chairman of the Department of Hawaiian Home Lands and the Hawaiian Homes Commission; HAWAIIAN HOMES COMMISSION; STANLEY YADAO, in his capacity as Vice-Chairman of the Hawaiian Homes Commission; ELEANOR K. AHUNA, HOALIKU L. DRAKE, BARBARA L. HANCHETT, MELVIN D. L. KALAHIKI, CLARENCE K. KAMAI, LINDA K. ROSEHILL, in their capacity as members of the Hawaiian Homes Commission, Defendants-Appellees

NO. 12137

(CIV. NO. 86-730)

MARCH 9, 1988

LUM, C.J., NAKAMURA, PADGETT, HAYASHI, AND WAKATSUKI, JJ.

OPINION OF THE COURT BY NAKAMURA, J.

Plaintiffs-appellants, "native Hawaiians" who are "qualified applicants for Hawaiian Home Land leases, including leaseholds in the Kamaoa-Puueo area of Ka'u, Hawaii[,]" sought a declaration that "General Lease No. 213 [issued by the Hawaiian Homes Commission (HHC or the Commission) to the Department of Transportation (DOT) is] null and void." Defendants-appellees,[1] claiming an absence of genuine issues of material fact and entitlement to judgment as a matter of law, moved for summary judgment. After hearing argument and reviewing the pleadings, the Stipulation Re: Agreed Facts and Admissibility of Documentary Evidence, and the exhibits and legal memoranda submitted by the

---

[1] The defendants named in the complaint were the Department of Transportation, its director, the Department of Hawaiian Home Lands, the chairman of the Hawaiian Homes Commission, the Hawaiian Homes Commission, its present members, and former commission members who served during the pendency of the controversy.

The Hawaiian Homes Commission is the executive board heading the Department of Hawaiian Home Lands.

parties, the Circuit Court of the Third Circuit concluded there was "no genuine issue as to any material fact[,]" the "Department of Hawaiian Home Lands . . . [was] authorized pursuant to § 204(2) of the Hawaiian Homes Commission Act, 1920, as amended,[2] and Hawaii Revised Statutes § 171-95 to issue General Lease No. 213 . . . ," and the department complied with "applicable procedures imposed by law" in granting DOT a lease of Hawaiian Homes land situated at Kaulana Bay in Ka'u, Hawaii for the construction and maintenance of a boat launching facility. The court thus awarded summary judgment to defendants-appellees. Reviewing the record on appeal, we affirm the judgment.

## I.

The lease in question covers approximately 4.3 acres within the 11,000 acre tract at Kamaoa-Puueo, Ka'u, on the island of Hawaii, which assumed the status of Hawaiian home lands upon the passage of the Hawaiian Homes Commission Act (HHCA or the Act) in 1920. *See* HHCA § 203(1). Though designated as "available lands" in section 203(1), the arid lands of Kamaoa-Puueo were not deemed suitable then for leasing to "native Hawaiians" for the purposes delineated in section 207 of the Act. The Commission thus returned Kamaoa-Puueo to the control of the Commissioner of Public Lands (the predecessor of the Board of Land and Natural Resources), as permitted by section 212, and for many years the tract remained under the jurisdiction of the department charged with the management and administration of "the public lands of the State and the water resources and minerals thereon." *See* Hawaii Revised Statutes (HRS) § 26-15.

HHC, however, chose to terminate the Land Board's authority over Kamaoa-Puueo and to assume jurisdiction in 1978. Since the lands reverted to its jurisdiction, HHC has authorized short-term use of portions thereof on a permit basis and generated income therefrom averaging $36,570 per year over the past six years. And in anticipation of developing the lands and resources at South

---

[2] The Act was originally enacted by Congress (*see* Act of July 9, 1921, c 42, 42 Stat. 108), but is now part of the State Constitution by virtue of the Admission Act. It is subject to amendment or repeal as prescribed in article XII of the State Constitution.

Point, Hawaii for more beneficial use, the Commission had a management plan for the area prepared in 1983.

But even before the Commission took this action, others had displayed interest in the Hawaiian home lands at South Point. Proposals had been advanced by private firms for the erection of windpower farms and the construction of a space satellite launching station there, and the U.S. Army Corps of Engineers was studying the feasibility of building a new breakwater at Kaulana Bay. HHC also received a request in 1983 from the State Department of Transportation for a lease to facilitate the construction and maintenance of a boat-launching facility at Kaulana Bay. The Commission's Land Management Division (LMD) recommended approval of DOT's request;[3] and at its meeting of May 26, 1983, the Commission outlined conditions upon which a 55-year lease of approximately 4.3 acres of land would be approved.

The matter was on the agenda again for the HHC meeting of July 28, 1983, when Plaintiff William Ahia and others voiced objections to the lease, and for the meeting of August 17, 1983. The Commission authorized the issuance of a lease at the latter meeting. But the parties to the lease did not reach final agreement on some specific terms until the end of August[4] and HHC's chairman signed General Lease No. 213 on October 3, 1983.

---

[3] The minutes of the meeting of May 26, 1983 reflect that the LMD justified its recommendation for approval on these grounds:

At the present time, the fishermen using South Point are trespassing and their use of the property is illegal; this lease would eliminate this problem and provide better security and management for all concerned. Although the basic upgrading of the facility will provide a better and safer situation for all of the general public, the presence of water, better access to South Point, the prospect of future jobs (i.e., licenses) for native Hawaiians, and the general upgrading and protection of the area is a direct benefit to the Department and its native Hawaiian beneficiaries. With respect to the Management Plan for Kamaoa-Puueo the Department is presently preparing, the proposed boat launching facility would be compatible with other uses being considered and could greatly enhance a Homesteading Program at South Point, if properly planned for. To this end, the LMD recommends approval of this request.

[4] On August 25, 1983, HHC "voted to accept the Department of Transportation's proposal as modified by the Commission. The modified conditions [were] as follows:

1. An independent appraiser, agreed upon by both parties, be hired to establish the fair market rental value.

The plaintiffs filed a multi-count suit in the United States District Court for the District of Hawaii on October 27, 1983 against a host of state, federal and county officials and other unidentified defendants, seeking a declaration that the lease was invalid and an injunction preventing an effectuation of its provisions. Pursuant to an agreement reached among the parties, however, the plaintiffs dismissed with prejudice their claims against the federal defendants and three counts alleging causes of action against state and county defendants. One count alleging a cause of action against the DOT and members of the Commission was dismissed without prejudice. The remaining count against the DOT is still pending in the federal district court.

The agreement among the parties further provided that the plaintiffs, the Commission, and the DOT would seek a ruling on the validity of the lease from this court upon an agreed statement of facts and that construction of a boat-launching facility would be held in abeyance pending a determination of the legal controversy by the State courts. We deemed it unwise to consider the question upon the statement presented. An issue with far-reaching implications, we felt, ought not be decided without the benefit of a fully developed factual foundation. Thus, on June 25, 1985 we dismissed the petition "without prejudice to the institution of an appropriate proceeding in a trial court of the State."

2. After an independent appraisal of the fair market rental value of the land is made, the rentals for the first 15 years of the lease are to be discounted on a present worth basis by the appraiser to a present day amount which will be utilized as the basis for which in-kind improvements to Hawaiian Homes Properties will be established. Such in-kind improvements shall be determined by the Department of Hawaiian Home Lands and must be constructed within three years from the effective date of the lease.

3. The Department of Transportation will sign the 221 agreement with the Corps of Engineers and assume responsibilities for the State's assurances. The Department of Transportation will also seek and obtain funds necessary to construct the agreed upon in-kind improvements.

4. After the first 15 years and every 15 years thereafter the lease shall be re-opened and the fair market rental determination shall be made in accordance with established procedures. The determination of in-kind compensation or other means of meeting the rental obligations will be reassessed at that time."

The plaintiffs brought an action in the Circuit Court of the Third Circuit on November 3, 1986, alleging that the lease in question was issued in violation of constitutional and statutory provisions and administrative rules and that the defendants thereby breached their fiduciary obligations to the intended beneficiaries of the Hawaiian Homes Commission Act. The primary relief they sought was a declaration of nullity with respect to General Lease No. 213 and injunctions against the disposition of Hawaiian Home lands by general lease to the DOT or to non-native Hawaiians until the plaintiffs and other eligible native Hawaiians were given "an opportunity to lease such lands under § 207(a) and § 204(2) of the [Hawaiian Homes Commission] Act."

After responding to the complaint, the defendants moved for summary judgment. The motion was submitted for decision upon stipulated facts, documentary evidence offered by the parties, and written and oral argument presented by opposing counsel. The circuit court took the matter under advisement on February 6, 1987, and it awarded defendants summary judgment on March 23, 1987 after finding no genuine issue as to any material fact and concluding there was authority under § 204(2) of the Act and HRS § 171-95 for the issuance of General Lease No. 213 to the DOT and the Department of Hawaiian Home Lands complied with procedures imposed by law in issuing the lease. The plaintiffs perfected a timely appeal from the judgment, and the question we thought a trial court should consider first is before us again.

II.

The plaintiffs urge reversal of the judgment on grounds that the Commission acted without authority in issuing General Lease No. 213, it failed to comply with § 212 of the Act in doing so, it did not give preference to native Hawaiians in leasing Hawaiian Home lands, and it is precluded from disposing of the land in question pursuant to § 204(2) because the land is needed for leasing to native Hawaiians under § 207(a) of the Act. We begin our analysis with a review of HHCA § 204(2) and HRS § 171-95, which in the trial court's view vested the Commission with the necessary authority to issue General Lease No. 213.

### A.

The pertinent portion of HHCA § 204(2) is the second paragraph, which reads:

> In the management of any retained available lands not required for leasing under section 207(a), the department may dispose of those lands to the public, including native Hawaiians, on the same terms, conditions, restrictions, and uses applicable to the disposition of public lands in chapter 171, Hawaii Revised Statutes; provided that the department may not sell or dispose of such lands in fee simple except as authorized under section 205 of this Act; provided further that the department is expressly authorized to negotiate, prior to negotiations with the general public, the disposition of a lease of Hawaiian home lands to a native Hawaiian, or organization or association owned or controlled by native Hawaiians, for commercial, industrial, or other business purposes, in accordance with the procedure set forth in section 171-59, Hawaii Revised Statutes, subject to the notice requirement of section 171-16(c), Hawaii Revised Statutes, and the lease rental limitation imposed by section 171-17(b), Hawaii Revised Statutes.

The paragraph is by no means esoteric. Still, an application of its provisions demands more than a cursory reading. For the language of the paragraph is meaningful only when read in conjunction with other provisions of the Act and HRS chapter 171.

To begin, the lands subject to leasing under § 204(2) are those designated as "available lands" in HHCA § 203[5] that are not required for "leasing under section 207(a)" which, in relevant part, reads:

> (a) The department is authorized to lease to native Hawaiians the right to the use and occupancy of a tract or tracts of Hawaiian home lands within the following acreage limits per each lessee: (1) not more than forty acres of agriculture lands or lands used for aquaculture purposes; or (2) not more than one hundred acres of irrigated pastoral lands and not more than one thousand acres of other pastoral lands; or (3) not more than one acre of any class of land to be used as a residence lot . . . .

---

[5] The lands of Kamaoa-Puueo head the list so designated in HHCA § 203.

If the Commission decides "any retained available lands are not required for leasing to native Hawaiians for purposes described in § 207(a)," the Commission may then "dispose of those lands to the public" on the "same terms, conditions, restrictions, and uses applicable to the disposition of public lands in chapter 171, Hawaii Revised Statutes[.]" The "terms, conditions, restrictions, and uses" applicable in the disposition of public lands to governments and governmental agencies are set forth in HRS § 171-95(a), which reads:

(a) Notwithstanding any limitations to the contrary, the board of land and natural resources may, without public auction:

(1) Sell public lands at such price and on such other terms and conditions as the board may deem proper to governments, including the United States, city and county, counties, other governmental agencies authorized to hold lands in fee simple and public utilities;

(2) Lease to the governments, agencies, and public utilities, public lands for terms up to, but not in excess of, sixty-five years at such rental and on such other terms and conditions as the board may determine;

(3) Grant licenses and easements to the governments, agencies, and public utilities on such terms and conditions as the board may determine for road, pipeline, utility, communication cable, and other rights-of-way;

(4) Exchange public lands with the governments and agencies;

(5) Execute quitclaim deeds to the governments and agencies, with or without consideration, releasing any claim to the property involved made upon disputed legal or equitable grounds, whenever the board in its discretion deems it beneficial to the State;

(6) Waive or modify building and other requirements and conditions contained in deeds, patents, sales agreements, or leases held by the governments and agencies whenever such waiver or modification is beneficial to the State.

And where the decision is to lease "available lands" "for commercial, industrial, or other business purposes," the Commission may

dispose of the lease through negotiation, first with native Hawaiians, in accord with the procedure described in HRS § 171-59. But in such case, the Commission must give notice of the intended disposition in accord with HRS § 171-16(c) and determine the minimum rent pursuant to the provisions of HRS § 171-17(b).

## B.

That the 4.3 acres covered by General Lease No. 213 are part of the "retained available lands" subject to management by the Commission and thus subject to disposition by lease "to the public, including native Hawaiians," is not disputed. The plaintiffs, however, would have us rule a government agency "is not a member of the public so as to fall within the purview of § 204(2) of the Act." We find no reason to apply "the public" so narrowly.

"Public" is "susceptible of various shades of meaning." *Territory v. Toyota,* 19 Haw. 651, 653 (1909). In one sense it means "everybody, and accordingly the body of the people at large" or "the community at large, without reference to the geographical limits of any corporation like the city, town, or county[.]" *Black's Law Dictionary* 1104 (rev. 5th ed. 1979). It is also apt in referring to "[t]he whole body politic, or the aggregate of the citizens of a state, nation, or municipality." *Id.* So employed, "public" refers to "organized government." *See The Random House Dictionary of the English Language* 233 (2d ed. 1987). In the past this court has "take[n] the word 'public' to mean of or relating to Government." *Oahu Ry. v. Brown,* 8 Haw. 163, 165 (1890).

When confronted by doubleness of meaning or indistinctiveness of an expression in a statute, as we are here, our function "is to ascertain and give effect to the intention of the legislature." *In re Hawaiian Telephone Co.,* 61 Haw. 572, 577, 608 P.2d 383, 387 (1980) (citations omitted). Parsing the lengthy sentence that comprises the paragraph with its history in mind, we are led to the ineluctable conclusion that the legislature intended "the public," as employed in § 204(2), would encompass the Government and its agencies.

Before its amendment in 1976, the paragraph, then the third paragraph of § 204(2), read:

In the management of any retained available lands not required for leasing under section 207(a), the department may

dispose of such lands by lease or license to *the general public,* including native Hawaiians, on the same terms, conditions, restrictions and uses applicable to the disposition of public lands as provided in chapter 171; provided, that the department may not sell such lands in fee simple except as authorized under section 205 of this Act.

HHCA § 204(2) (HRS 1968) (emphasis supplied). After the amendment, the paragraph read:

In the management of any retained available lands not required for leasing under section 207(a), the department may dispose of such lands to *the public,* including native Hawaiians, on the same terms, conditions, restrictions and uses applicable to the disposition of public lands as provided in chapter 171; provided, that the department may not sell or dispose of such lands in fee simple except as authorized under section 205 of this Act.

Session Laws of Hawaii (SLH) 1976, c 24, § 1 (emphasis supplied).

A purpose of the amendment was "to grant the Department of Hawaiian Home Lands full authority to manage available Hawaiian home lands not required for leasing[.]" Sen. Standing Comm. Rep. No. 600-76, in 1976 Senate Journal, at 1141. The legislative committee reports accompanying the amendatory measure, however, give no reason for the deletion of "the general public" and the substitution instead of "the public." Still, the legislative action can only signify the perception of a dissimilarity of meaning and an intention to effect some change in the application of the statute. In light of the stated purpose to invest the Commission with "full authority to manage retained available . . . lands," we think the amendment could only have been meant to dispel any notion that the Commission was not vested with such authority, including the power to lease to the government or its agencies "available lands not required for leasing under section 207(a)."

The deleted term, in our view, is apt when reference is made to the people or community at large. *See Black's Law Dictionary, supra; see also Rayor v. City of Cheyenne,* 63 Wyo. 72, 81, 178 P.2d 115, 116 (1947) ("The general public embraces all the people."). But it would not be appropriate if the intended reference is to "organized government." *See The Random House Dictionary of the English Lan-*

*guage, supra.* Hence, we could not logically infer the legislative intent was to prevent the issuance of leases to the Government or its agencies of available lands not needed for the purposes described by § 207(a) when the substitution of terms occurred. For the language change would not have effectuated such design.

The subsequent amendment of § 204(2) by the Constitutional Convention of Hawaii of 1978 bolsters the conclusion that an intendment of the 1976 amendment was to render clear the Commission's authority to lease, to the Government or its agencies, lands not required for leasing under § 207(a). The constitutional assembly "changed the language in Section 204 of the Act in order to grant the department more control of their lands." Stand. Comm. Rep. No. 56, in 1 *Proceedings of the Constitutional Convention of Hawaii of 1978,* at 633 (1980) [hereinafter *1978 Proceedings*]. With respect to § 204(2), the convention "added language . . . in order to [enable the Commission] to lease lands directly and preferentially to native Hawaiians for commercial, industrial or other business purposes." *Id.* The means chosen to accomplish this was the second proviso to § 204(2), which reads:

> provided further that the department is expressly authorized to negotiate, prior to negotiations with *the general public,* the disposition of a lease of Hawaiian home lands to a native Hawaiian, or organization or association owned or controlled by native Hawaiians, for commercial, industrial, or other business purposes, in accordance with the procedure set forth in section 171-59, Hawaii Revised Statutes, subject to the notice requirement of section 171-16(c), Hawaii Revised Statutes, and the lease rental limitation imposed by section 171-17(b), Hawaii Revised Statutes.

Comm. Proposal No. 11, in *1978 Proceedings,* at 809-10 (emphasis supplied).

What is significant, of course, is that the phrase discarded in 1976 by the legislature reappears in the proviso designed to afford preferential treatment for native Hawaiians when the Commission decides to lease Hawaiian home lands for "commercial, industrial or other business purpose." As employed therein, "general public" could only mean the public or the community at large, not the government. Significant too is the requirement that the disposition

of leases thereunder must follow the procedure set forth in HRS § 171-59 rather than in § 171-95, which governs the disposition of leases "to governments, government agencies, and public utilities[.]" HRS § 171-95. The constitutional assembly, like the legislature, recognized that "the public" and "the general public" are not necessarily synonymous and employed the latter term in authorizing a preference for native Hawaiians over the rest of the community at large when the Commission disposed of a lease of Hawaiian home lands for "business purposes."

### III.

Having concluded that section 204(2) permits a lease to a government agency of "retained available lands not required for leasing under section 207(a)," we turn to the question of whether the Commission's action in leasing 4.3 acres of land to the DOT was consistent with other provisions of the Act and with procedures imposed by law.

### A.

As we noted, the Department of Hawaiian Home Lands is authorized under § 207(a) of the Act

to lease to native Hawaiians the right to the use and occupancy of a tract or tracts of Hawaiian home lands within the following acreage limits per each lessee: (1) not more than forty acres of agriculture lands or lands used for aquaculture purposes; or (2) not more than one hundred acres of irrigated pastoral lands and not more than one thousand acres of other pastoral lands; or (3) not more than one acre of any class of land to be used as a residence lot[.]

The lands in question, the appellants urge, "are . . . immediately needed for [the foregoing] purposes . . . [and] should not have been disposed of pursuant to § 204(2) of the Act[.]" They maintain the people of Ka'u "have had homestead applications filed with DHHL for these lands but none of the applications have been processed" and "[t]he Commission contracted for a Management Plan for the area with the understanding that 'homestead settlement on the land would be the highest priority.' "

True, the lands of Kamaoa-Puueo have never been leased to native Hawaiians for any of the purposes delineated in § 207(a), but for good reason. "Ka'u," as the Commission's chairman observed, "is wide-open, unimproved, abused by non-native as well as native Hawaiians." Minutes of the meeting of the Commission conducted on July 28, 1983. "[T]here is potential for the area but water is critical." *Id.* And the Commission decision to lease 4.3 acres to the DOT was founded in part on a belief that "[t]he arrangement . . . is one that would enhance Ka'u by bringing water to the area for the benefit of the Ka'u residents and making it possible to start a homesteading community there." *Id.* Under the circumstances, we discern no basis for holding the lands in question were not disposable by lease pursuant to § 204(2) of the Act.

The Department of Hawaiian Home Lands "was established by the Act to provide a means to rehabilitate its beneficiaries through a series of projects[.]" Stand. Comm. Rep. No. 56, in *1978 Proceedings*, at 631. Unfortunately the department "was given very little financial assistance to perfect its mandate[,]" and "must lease [some available lands] in order to generate revenues to support its administrative and operating budget." *Id.* Here, 4.3 acres of the 11,000 acre tract of unimproved lands were leased to a government agency to "enhance a Homesteading Program at South Point" the department hopes to establish. *See supra* note 2. We could hardly deem this less compatible with the mandate to rehabilitate native Hawaiians through a series of projects than leasing available lands to generate revenues for the department's administrative and operating budget.

We also find no merit in the appellants' alternative position that the department was obliged, nonetheless, to give preference to native Hawaiians in the disposition of the lease. If the decision had been to lease the land in question "for commercial, industrial, or other business purposes," the second proviso in the second paragraph of section 204(2) which authorizes such preferential treatment would have applied. But we would not characterize the construction and maintenance of a boat-launching facility by a government agency as a "commercial, industrial, or other business" activity. Thus, we examine the procedure followed by the department in the light of applicable statutory provisions to decide whether the requirements of law were met.

## B.

When the disposition of Hawaiian home lands under the authority of section 204(2) of the Act is by way of a lease to a government agency, the controlling statute is HRS § 171-95, more particularly § 171-95(a)(2) which provides:

(a) Notwithstanding any limitations to the contrary, the board of land and natural resources [the Commission in this instance] may, without public auction:

.   .   .   .

(2) Lease to the governments, agencies, and public utilities, public lands for terms up to, but not in excess of, sixty-five years at such rental and on such other terms and conditions as the board may determine[.]

And when the use of Hawaiian home lands by a government agency "directly benefits the department or homestead lessees," the rent may be nominal.[6]

The lease here is for a term of fifty-five years, within the sixty-five year limitation imposed by law, and lease rent payable for the first fifteen years is set at $41,164, though the market value of such rent as determined by an independent appraiser was $10,575. Gen. Lease No. 213.[7] The lease provides, however, that in lieu of rent the DOT "shall within three years [of its effective date] construct such improvements desired and intended to accelerate the distribution of Hawaiian home lands for homestead purposes in the Kamaoa-Puueo, Ka'u, Hawaii area . . . as requested and approved by Lessor at a cost of $50,000." Id. There is provision too for the redetermination of lease rental at the end of the 15th, 30th, and 45th years of the fifty-five year term. Id.

---

[6] Section 212 of the Act provides:

Notwithstanding the provisions of section 171-95, Hawaii Revised Statutes, in the leasing of Hawaiian home lands by the board to a public utility or other governmental agency, where such use directly benefits the department of Hawaiian home lands or the homestead lessees, the rental may be nominal; in all other instances, the lease rental shall be no less than the value determined in accordance with section 171-17(b), Hawaii Revised Statutes.

[7] The lease recites that the upset annual rental as determined by appraisal was $1,144 and the present value of the lease rents for the first 15 years of the lease was $10,575.

Under the circumstances, we can only conclude the requirements of law were met and there is no reason for us to disturb the Commission's exercise of discretionary authority to lease the lands in question "at such rental and on such other terms and conditions as [it] may determine[.]" HRS § 171-95(a)(2).

The judgment of the Circuit Court of the Third Circuit is affirmed.

*Yuklin Aluli* for appellants.

*George K. K. Kaeo, Jr.,* Deputy Attorney General, for appellees.

DISSENTING OPINION BY PADGETT, J.,
WITH WHOM HAYASHI, J., JOINS

I respectfully dissent from the affirmance of the summary judgment in this case because, in my judgment, there is a sufficient question, in the record, as to whether the appellees fulfilled their fiduciary duties, as trustees for native Hawaiians, to require a trial of the issue, with additional evidence, and findings of fact and conclusions of law.

I.

The appellees claim the power to issue the lease in question under the second paragraph of § 204(2) of the Hawaiian Homes Commission Act, which reads as follows:

In the management of any retained available lands not required for leasing under section 207(a), the department may dispose of those lands to the public, including native Hawaiians, on the same terms, conditions, restrictions, and uses applicable to the disposition of public lands in chapter 171, Hawaii Revised Statutes; provided that the department may not sell or dispose of such lands in fee simple except as authorized under section 205 of this Act; provided further that the department is expressly authorized to negotiate, prior to negotiations with the general public, the disposition of a lease of Hawaiian home

lands to a native Hawaiian, or organization or association owned or controlled by native Hawaiians, for commercial, industrial, or other business purposes, in accordance with the procedure set forth in section 171-59, Hawaii Revised Statutes, subject to the notice requirement of section 171-16(c), Hawaii Revised Statutes, and the lease rental limitation imposed by section 171-17(b), Hawaii Revised Statutes.

Appellees contend that the lease in question is not for a "commercial purpose" but for a "public purpose". It does not seem to me, in the circumstances of this case, that the two terms are mutually exclusive. The lease is for a boat ramp. A boat ramp serves a public purpose, in that it is used by members of the boating public. It can, and often does, also serve a commercial purpose, in that fees can be charged for the use of the ramp by members of the public. Nothing in the lease in question excludes such charges being made by the lessee.

Appellees say that they have the power, under the Act, to make leases to government agencies as they will, and that, because they considered that the lease in question would be of benefit to native Hawaiians, by providing improvements to tract lands, we should honor their expertise in the field, and grant deference to their determination. The Department of Hawaiian Home Lands is not, however, an ordinary government agency. As we said in *Ahuna v. Department of Hawaiian Home Lands,* 64 Haw. 327, 640 P.2d 1161 (1982):

In dealing with eligible native Hawaiians collectively or individually, appellant must adhere to high fiduciary duties normally owed by a trustee to its beneficiaries.

*Id.* at 338. Later in that case, we said:

One specific trust duty is the obligation to administer the trust solely in the interest of the beneficiary. . . .

A second fundamental trust obligation is to use reasonable skill and care to make trust property productive, . . . or simply to act as an ordinary and prudent person would in dealing with his own property. . . .

Given these two basic duties of a trustee, we now impose them on the Hawaiian Homes Commission, the individual

commissioners, and the Department to determine whether there has been a breach of fiduciary duties.

*Id.* at 340.

*Ahuna* and other cases which have come before us indicate that the Department is sometimes less than perfect in executing its fiduciary duties.

Appellants, in their complaint at paragraphs 1, 28, 45, 46 and 52, allege that they are native Hawaiians, willing to take the lease in question. In the answer, most of the allegations of paragraph 1 are admitted. The remaining allegations of paragraph 1 and the allegations of paragraph 28 and 52 are denied for lack of knowledge. The allegations of paragraph 45 are admitted and the allegations of paragraph 46 are denied. Therefore, the question of the willingness and ability of the appellants to accept and carry out the lease in question was at issue. Nothing in the stipulation of facts or the papers in support of the motion for summary judgment refutes their claim.

Moreover, there is nothing in the record to indicate that the appellees ever gave any consideration to attempting to find a lessee who was a native Hawaiian, or an organization controlled by native Hawaiians, or that granting of a lease, equivalent to General Lease No. 213, to such a lessee could not have served the purposes of the trust equally as well as granting a lease to the Department of Transportation (DOT).

I would hold that so long as the lease in question had commercial as well as public aspects to it, the appellees, as fiduciaries, had a duty under the second paragraph of § 204(2) of the Hawaiian Homes Commission Act to, at least, give consideration to making the lease in question to beneficiaries of the Act and, accordingly, would reverse the summary judgment.

## II.

A disposition of this case under I, above, would avoid the necessity of construing the second paragraph of § 204(2) to determine if appellees have the power, thereunder, to dispose of trust lands to other government agencies for "public purposes." Since I am unable to persuade a majority of my brethren on the narrow trust issue, I must then deal with the construction question.

The Hawaiian Homes Commission Act, 42 Stat. 108, is a federal statute originally adopted by the Congress of the United States in 1921. Article 4 of the Hawaii Admission Act, 73 Stat. 4, gave the new State of Hawaii power to amend the Hawaiian Homes Commission Act by statute only with the consent of the United States. With respect to § 204(2) of the Hawaiian Homes Commission Act, the Admission Act, however, provided:

> Provided, That . . . paragraph (2) of section 204, . . . relating to the powers and duties of officers other than those charged with the administration of said Act, may be amended in the constitution, or in the manner required for State legislation[.]

The lease in question was issued in 1983, but the amendment to § 204(2) by Act 271 of the Session Laws of 1965 was not approved by Congress until October 27, 1986. 100 Stat. 3143. I assume that that approval was retrospective in nature and validated the lease in question. Since the Hawaiian Homes Commission Act remains a federal statute, its proper construction is a matter of federal law, upon which we, of course, do not have the last word.

Appellees contend that they have power under the first clause of the second paragraph § 204(2) to make the lease in question. They assert that clause gives them the same power that the Department of Land and Natural Resources (DL&NR) has under HRS Chapter 171 in dealing with other public lands. They point to HRS § 171-95 as giving the DL&NR the power to make leases such as General Lease No. 213. In other words, appellees argue that the phrase "the department may dispose of those lands to the public, including native Hawaiians, on the same terms, conditions, restrictions, and uses applicable to the disposition of public lands under chapter 171" means that they may make dispositions (except in fee) to government agencies for public purposes as they choose.

The first question then is whether a government agency is a part of the "public". While a government agency is often called a public agency, nevertheless, the function of the government is to serve the public and, in common usage, the government and the public are separate. I would not, therefore, in this context, construe "public" as including the government.

The second problem is with the argument that the granting of the right to the department to dispose of lands to the public in-

cludes the right to dispose of them for a "public purpose". There is, in the Hawaiian Homes Commission Act in § 207, a specific provision dealing with dispositions of lands for a "public purpose". Section 207(c)(1) expressly provides, in summary, as the parties to this action agree, that the Department of Hawaiian Home Lands can grant easements for railroads, telephone lines, electric power and light lines, gas mains, and the like. It further provides that the Department can grant *licenses* within a district in which lands are leased under the provisions of the Act, for, among other things, public purposes. If the provision in § 204(2) granting the Department the power to dispose of lands to the public encompasses the power to make dispositions for a "public purpose", then the provisions of § 207(c) of the Act are mere surplusage, devoid of any effect.

Moreover, the "public purpose" clause in § 207(c), under the principle of *ejusdem generis,* seems to encompass uses which directly benefit the particular Hawaiian Home tract, rather than a benefit to the public at large which, as in this case, only incidentally, by virtue of the construction requirements in the lease, also benefits the trust.

Section 212 of the Hawaiian Homes Commission Act, with respect to lands returned by the Department to the DL&NR, specifically provides:

> Notwithstanding the provisions of section 171-95, Hawaii Revised Statutes, in the leasing of Hawaiian home lands by the board to a public utility or other governmental agency, where such use directly benefits the department of Hawaiian home lands or the homestead lessees, the rental may be nominal; in all other instances, the lease rental shall be no less than the value determined in accordance with section 171-17(b), Hawaii Revised Statutes.

HRS § 171-17(b) provides:

> Drawing or negotiation. The sale price or lease rental of lands to be disposed of by drawing or by negotiation shall be no less than the value determined by a disinterested appraiser or appraisers whose services shall be contracted for by the board, and such appraisal, and any further appraisal made at the re-

quest of the purchaser and with the approval of the board, shall be at the cost of the purchaser.

The record reflects that the appraiser, under the DOT's proposal to the appellees, was directed to discount the fair rental value of the land in question and the lease, by its terms, substituted in place of some of the rent, improvements of a specified value. Moreover, the lease does not restrict the area on which those improvements may be constructed, to the area affected by the lease, but allows the appellees to require their construction anywhere within the 11,000 trust acres in Kamaoa-Puueo.

Thus, under § 212 of the Hawaiian Homes Commission Act, the DL&NR, exercising its powers under HRS § 171-95, could not have done what appellees have done, with respect to the lease in this case.

Appellees argue, however, in their brief, that "dispose of those lands to the public" provision in the second paragraph of § 204(2) gives them broader powers than the DL&NR would have with respect to making leases of Hawaiian home lands for public purposes. This last argument of appellees is, in effect, that they have the right, unrestricted by any provision in the statutes, to lease trust lands to other government agencies for public purposes, and that, for the protection of the trust, we must rely entirely upon their word that they are, in such instances, acting for the benefit of the trust. The breadth of the argument, in the light of *Ahuna,* and past experience, points out the danger of adopting appellees' broad construction of the disposal phrase in the second paragraph of § 204(2) of the Hawaiian Homes Commission Act.

I would read the Hawaiian Homes Commission Act, as amended, as a whole. It appears to contain in its language a complete framework for dealing with the trust lands. It permits, under § 207(c) (1), the appellees to make dispositions for public utilities easements and, in certain instances, for public purposes. It permits lands, not being used and turned over to the DL&NR, to be leased under HRS § 171-95 with certain very definite restrictions as spelled out in HRS § 171-17(b). It permits the Hawaiian Homes Commission, with restrictions, to make leases to the public. It does not, in my judgment, grant the appellees the unrestricted power

they claim to make leases for public purposes to other government agencies.[1]

Thus, on the question of power to make the lease, I would also reverse the judgment below.

---

[1] I realize, from the record, that the Department has frequently exercised its claimed power, and that legislative action would be necessary to validate those acts under my construction. However, if there is to be a power, in the Department, to turn over trust lands to other government agencies, it should be as a result of express language enacted by the legislature and approved by Congress with a full public debate on the desirability and the terms thereof. We owe the trust and its native Hawaiian beneficiaries no less.