891 P.2d 279

The AGED HAWAIIANS, an unincorporated association, Plaintiffs–Appellants,

v.

HAWAIIAN HOMES COMMISSION; Kali Watson, in his capacity as Chairman-designate of the Hawaiian Homes Commission;[1] Andrew Apana, Nani Brandt, Rockne Freitas, Dennis Kauahi, Llewellyn Kumalae, Ann Nathaniel and Patricia Sheehan, in their capacities as members of the Hawaiian Homes Commission; and The Department of Hawaiian Home Lands, Defendants–Appellees.

No. 16974.

Supreme Court of Hawai'i.

March 14, 1995.

---

**1.** The present action was initially instituted on July 17, 1989 against Ilima Pi'ianaia, then-Chairman of the Hawaiian Homes Commission, and Commissioners Andrew Apana, Nani Brandt, Edison Keomaka, Alvina Park, George Robertson and Walter Smith, Jr. After the 1994 general election, and while the case was pending before us, newly elected Governor Benjamin Cayetano appointed Kali Watson to succeed former Chairperson Hoaliku Drake (who had earlier replaced Pi'ianaia) as Chairman of the Hawaiian Homes Commission as of January 1, 1995, subject to the advice and consent of the Senate. *See* Haw. Const. art. V, § 6, ¶ 2 (1978). Pursuant to Hawai'i Rules of Appellate Procedure (HRAP) Rule 43(c)(1), Watson has been substituted automatically for Pi'ianaia as a defendant in the instant case. Similarly, Freitas, Kauahi, Kumalae, Nathaniel and Sheehan have been automatically substituted as Commissioners who were nominated and appointed in accordance with HRS § 26-34 (1985). One seat on the Commission, designated for a resident of O'ahu, remains vacant after the resignation of Robert McFarlane.

the circuit court properly dismissed the Aged Hawaiians' federal claims under 42 U.S.C. § 1983.

## I. BACKGROUND

At the inception of the Hawaiian homelands program, the Commission was given control over approximately 200,000 acres of land from which it was to create homesteads for native Hawaiian beneficiaries. The HHCA created three categories of homestead lots: agricultural, pastoral, and residential. *See* 1 Haw.Rev.Stat. 167, 182 (1985) (HHCA, 1920, § 207(a)). This case focuses on the Commission's administration of homelands in the pastoral category.

In 1952, the Commission withdrew 18,000 acres of pastoral land, including portions of Pu'ukapu on the Big Island of Hawai'i, from general leasing (i.e., leases to non-beneficiaries under HHCA § 204) for homesteading. The Commission then selected 187 out of 427 original applicants as the "best qualified" potential pastoral lessees (i.e., those with the maximum chance of success at commercial ranching) and placed them on a waiting list. Forty-eight pastoral homestead lots ranging in size from 200 to 300 acres were awarded to those at the top of that waiting list. The Commission decided not to award lots on the remaining portions of the Pu'ukapu homestead lands "until it [could] be determined whether the rainfall in the vicinity [could] support individual small ranches." While many native Hawaiian beneficiaries remained on the waiting lists for homestead lots, much of the acreage was instead used for general leasing, ostensibly in order to raise revenue to prepare the land for homesteading.[3]

Eventually, as part of its 1987 Raw Lands Acceleration Program, the Commission adopted a policy to award pastoral lots of no

Paul Nahoa Lucas (Alan T. Murakami with him on the briefs of the Native Hawaiian Legal Corp.), Honolulu, for plaintiffs-appellants.

Steven S. Michaels (Girard D. Lau, Clayton Lee Crowell, Sonia Faust and George K.K. Kaeo, Jr., with him on the brief), Deputy Attys. Gen., Honolulu, for defendants-appellees.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

KLEIN, Justice.

The Aged Hawaiians, an unincorporated association that includes native Hawaiian beneficiaries under the Hawaiian Homes Commission Act (HHCA),[2] appeal from the third circuit court's order granting in part and denying in part a motion by the Hawaiian Homes Commission (Commission), the individually named members of the Commission, and the Department of Hawaiian Home Lands (DHHL) (collectively the Appellees) to dismiss the Aged Hawaiians' Second Amended Complaint, or alternatively, for summary judgment. Although the factual and procedural elements presented in this appeal are complex, the fundamental issue is whether

---

**2.** *See* HHCA, 1920; Act of July 9, 1921, c. 42, 42 Stat. 108 (codified as amended at 48 U.S.C. note prec. § 491 (1988) and Haw. Const. art. XII, § 1), *reprinted in* 1 Haw.Rev.Stat. 167 (1985) and 1 Haw.Rev.Stat. 39 (Supp.1992) (hereafter, the HHCA will be cited as reprinted in Haw.Rev. Stat.).

**3.** As of 1989, according to a DHHL annual report, at least 44,000 acres of pastoral land on the Big Island of Hawai'i were under general lease to various entities and individuals who are not native Hawaiian homesteaders. In 1956, the

waiting list was cancelled without notice to the beneficiaries. During the period from 1956 to 1983, when the waiting list was finally reinstated, the Commission awarded seven pastoral lots in Waimea to persons who were not on the list.

Since the inception of the program in 1920, the Commission has awarded only about 38,000 acres to native Hawaiian homesteaders (in the agricultural, pastoral and residential classes combined) out of the approximately 187,000 acres that were potentially available for all types of homesteading. Additional acreage was added

more than 100 acres based on a "subsistence ranching" concept designed to enable native Hawaiian homesteaders to supplement their family needs. Although no awards were made under this subsistence ranching policy, which formally expired at the end of 1987, the Commission continued to analyze possible future pastoral awards based on this policy.

On July 25, 1988, James Akiona submitted a petition to the Commission seeking a contested case hearing.[4] He hoped to (1) "pres-

ent evidence of [his] desire and capability to engage in commercial ranching activities at Pu'ukapu" and (2) challenge the potential issuance of subsistence ranching leases because such awards would be inconsistent with HHCA §§ 207 and 219.1.[5] On December 20, 1988, while Akiona's request was pending, the Commission adopted "ten premises" or guidelines for its pastoral development program.[6]

On February 21, 1989, the Commission notified Akiona that it had denied his con-

at the end of 1994 to make the trust corpus whole at a little more than 200,000 acres.

4. At some unknown point before or after Akiona made this request, the individual preceding him on the waiting list passed away.

5. 1 Haw.Rev.Stat. 167, 182–83 (1985) (HHCA, 1920, §§ 207(a) and (b)) provides, in pertinent part:

**Leases to Hawaiians, licenses.** (a) The department is authorized to lease to native Hawaiians the right to the use and occupancy of a tract or tracts of Hawaiian home lands within the following acreage limits per each lessee: (1) not more than forty acres of agriculture lands or lands used for aquaculture purposes; or (2) *not more than one hundred acres of irrigated pastoral lands and not more than one thousand acres of other pastoral lands;* or (3) not more than one acre of any class of land to be used as a residence lot....

(b) The title to lands so leased shall remain in the [State]. Applications for tracts shall be made to and granted by the department, under such regulations, *not in conflict with any provisions of this title,* as the department may prescribe. The department shall, whenever tracts are available, enter into such a lease with any applicant who, in the opinion of the department, is qualified to perform the conditions of such lease.

(Emphasis added.) 1 Haw.Rev.Stat. 167, 201 (1985) (HHCA, 1920, § 219.1) provides:

**General assistance.** The department is authorized to carry on any activities it deems necessary to assist the lessees in obtaining maximum utilization of the leased lands, including taking any steps necessary to develop these lands for their highest and best use commensurate with the purposes for which the land is being leased as provided for in section 207, and assisting the lessees in all phases of farming, ranching, and aquaculture operations and the marketing of their agricultural or aquacultural produce and livestock.

6. The "ten premises" were subsequently promulgated as a rule under Hawai'i Revised Statutes HRS chapter 91, pursuant to an order by the

third circuit court dated October 4, 1989. Hawai'i Administrative Rule (HAR) § 10–3–29, entitled "Considerations for pastoral homestead development," provides that "[i]n developing pastoral lots for homestead award, the department shall consider":

(1) That the awarding of pastoral homestead lots is to provide opportunities for a lifestyle which includes allowing for production of livestock to satisfy family needs and supplement family income.

(2) That the needs of applicants on the entire pastoral waiting list will be considered in the awarding of pastoral homestead leases.

(3) That there are competing demands for pastoral homestead development, including demands for residential and agricultural homesteads as well as land for commercial ranching uses.

(4) That basic infrastructure improvements for pastoral homestead lots such as suitable access, water, and utilities should be available.

(5) That the cost per lot for infrastructure improvements for pastoral homestead lots will be comparable with that of residential and agricultural homestead lots. On-going maintenance costs are a factor in this cost per lot equation.

(6) That a minimum pastoral homestead lot size will be based on the land's natural carrying-capacity to support a minimum of two animal units of beef livestock.

(7) That the regional character of communities is important in defining the type and size of homestead lease as similar types of development in the region offer models of what can be done with land for development.

(8) That the determination of pastoral homestead lot size be based on the land's natural carrying-capacity for beef animals, infrastructure development costs, regional character and beneficiary demand identified through the waiting list.

(9) That opportunities for native Hawaiians to develop commercial ranching opportunities be provided.

(10) That the homestead lease in its current form presents difficulties in financing for commercial ranching operations.

tested case hearing request. The Commission determined that there was no basis for granting the request because (1) the Commission had not yet initiated any action on Akiona's application for a pastoral homestead lease, (2) there was no substance to support the petition, and (3) a contested case hearing would be inappropriate. Later, the Commission proposed to offer 195 lots (ranging in size from five to twenty acres) on 3,000 acres of Pu'ukapu lands, which were to be awarded in early summer 1989 in accordance with the Commission's "ten premises" rule.[7]

On July 17, 1989, Akiona and the Aged Hawaiians filed a complaint for declaratory and injunctive relief in the third circuit court. On August 31, 1989, Akiona and the Aged Hawaiians moved for partial summary judgment on their claim that the "premises" were rules requiring compliance with the official notice-and-comment provisions of HRS chapter 91. The motion was granted on October 4, 1989, and the trial court issued an order enjoining future pastoral lot awards until the Commission complied with chapter 91. On January 30, 1990, the circuit court denied a motion by Akiona and the Aged Hawaiians dated December 26, 1989, in which they sought summary judgment and a permanent injunction with respect to their remaining claims. On the same day, the circuit court also denied their December 28, 1989 motion seeking certification as a class action on behalf of all qualified beneficiaries "who seek a pastoral homestead lot large enough to allow them to become economically self-sufficient by ranching."

> The Commission acknowledged that these premises each have definite implications for pastoral homesteading. For example, through the first premise, "DHHL is indicating that it is not awarding 'economic' pastoral units [i.e., lots capable of supporting commercial ranching]. Rather, it is awarding entitlements which allow for the raising of livestock to satisfy family needs for consumption and for supplementary income. An 'economic unit' by today's standards may consist of 1,000 acres or more of unirrigated pasture." The ninth premise indicates that "DHHL is aware that there are native Hawaiian organizations who desire to develop commercial ranching operations. This premise recognizes this fact and mandates DHHL to identify lands which should be set aside for commercial ranching by native Hawaiians."

Notwithstanding what the Appellees characterize as "serious deficiencies" in the circuit court's October 4, 1989 decision, the Commission and DHHL formally adopted a rule containing the ten premises on May 22, 1990. See HAR § 10–3–29, *supra* note 6. At the public hearings held by the Commission prior to this rule-making action, the Aged Hawaiians submitted an alternative procedural proposal for awarding pastoral homestead lots. The Commission declined to adopt the Aged Hawaiians' proposal, but voted unanimously: "[to] address the concerns of those native Hawaiians who have the capability to commercial ranch [sic]; that these native Hawaiians be given the opportunity to do so; and, that [DHHL] present to [the Commission] a proposal to effectuate commercial ranching." However, the Commission did not suspend the awarding of lots until the DHHL could prepare a proposal, and the record does not indicate that the DHHL has ever presented such a proposal.

On July 31, 1990, a mere ten days after HAR § 10–3–29 was approved by the Governor, the Commission adopted its 1990 pastoral lot size plan (1990 Plan). The Commission took this action without consulting the Aged Hawaiians or Akiona, despite their repeated requests for information and attempts to secure an opportunity to comment. The only substantive change from the 1990 Plan's predecessor was the addition of eight 100 acre and eight 200 acre lots at Pu'ukapu, plus twenty-two unimproved homestead lots at Ka'u (seventeen lots at twenty-five acres each) and Humu'ula (five lots at 100 acres each).[8] The larger lots were not created as

7. In September 1989, the Commission downsized the Pu'ukapu pastoral development plan to 166 lots ranging from 10 to 20 acres in an attempt to place on the land all surviving beneficiaries from the original 1952 waiting list.

8. According to the Appellees, they rejected an alternative plan to award "one or two thousand acre lots" based on information that " 'commercial-scale ranching' is economically impossible in the absence of at a minimum of a full 1,000 acre award[.]" There is a factual dispute, however, on the issue of feasibility. A current homesteader operates a successful commercial ranch on a 305–acre lot, as do other pastoral homestead lessees. DHHL was aware of these enterprises as early as 1985, and apparently reported these facts to the Los Angeles Times. Furthermore,

"economic units," *see supra* note 6, but as "good faith responses" to the desires of those beneficiaries who sought commercial ranching opportunities.

On August 23, 1990, Akiona and the Aged Hawaiians filed two motions: (1) seeking a preliminary injunction to prevent DHHL from awarding subsistence pastoral lots under the 1990 Plan, and (2) seeking to amend their complaint. In denying the motion for preliminary injunction, the circuit court held that the Aged Hawaiians' members would

> not be irreparably harmed [because] their priority status [assures] that they will be offered lots and *they will still be able to litigate the remaining issues* in this case. The issue of whether [the Aged Hawaiians] are likely to prevail on the merits is a *close question;* the public interest favors the awarding of the lots to the beneficiaries.

"Order Denying Motion for Preliminary Injunction; Order Granting Motion to Amend Complaint," dated September 4, 1990. (Emphasis added.)[9] The Aged Hawaiians' first amended complaint, which was dated September 21, 1990, addressed the changed circumstances accompanying adoption and subsequent implementation of the 1990 Plan, and also asserted jurisdiction under HRS § 91–14. On September 15, 1990, those on the waiting list selected all of the available lots, with the first twenty-one applicants (including Akiona) allowed a right of first refusal upon the 100 and 200 acre lots.

On September 18, 1990, Akiona and the Aged Hawaiians filed their third motion for summary judgment, which included a request for permanent injunctive relief. The Commission's Chairperson, Hoaliku Drake, responded by sending a letter dated September 21, 1990 to the awardees notifying them of the pending litigation. This letter informed the awardees that the lawsuit by Akiona and the Aged Hawaiians sought "to prohibit the department from issuing you your pastoral lease ... and challeng[es the Commission's] July 31, 1990[ ] action authorizing the award of the pastoral lots selected on September 15, 1990[.]" One week after Drake wrote her letter, Akiona withdrew from the litigation by stipulation of the parties.[10] Although a hearing on the motion for summary judgment was scheduled to take place on September 28, 1990, the record does not indicate that any action was taken. Evidently, the remaining parties instead entered into consensual mediation in an unsuccessful effort to settle the suit.

In the ensuing months, the Aged Hawaiians amended their complaint once again,[11] requested answers to interrogatories, and sought the production of documents by the Appellees. Thereafter, on January 15, 1992, the Aged Hawaiians filed their fourth motion for summary judgment, again requesting permanent injunctive relief. In this motion, the Aged Hawaiians sought:

> 1) [a declaration] that the ... Commission violated the due process rights of the [Aged Hawaiians] by failing to: (a) provide them with adequate notice of its July 31, 1990 decision determining when, where, and how much pastoral land to award at Pu'ukapu to those on the applicable wait list; and (b) afford them the opportunity to request that an evidentiary hearing be

---

expert testimony presented by the Aged Hawaiians' witnesses indicates that commercial ranching in this area would be feasible on 400 to 900 acres. *See also* discussion of legislative history concerning increased carrying capacity associated with the use of intensive ranching techniques, *infra* section III.B.4.

**9.** The court's decision to deny injunctive relief is understandable given the fact that at least one family suffered irreparable harm as a result of delays caused by the litigation. An applicant on the waiting list died sometime between the October 4, 1989 court order enjoining future pastoral homestead lot awards and the court's September 4, 1990 order denying Akiona and the Aged Hawaiians' motion to enjoin implementation of the

1990 Plan. Although this deceased applicant named his daughter as successor—based on her 25% Hawaiian blood, she would have qualified to succeed in the leasehold interest if it had been awarded—she did not qualify for an award in her own right (50% Hawaiian blood required).

**10.** Akiona apparently withdrew after receiving "threats of physical harm."

**11.** The Appellees stipulated to this amendment. The August 2, 1991 second amended complaint removed Akiona as a named party and replaced the first amended complaint's assertion of jurisdiction under HRS § 91–14 with the original complaint's citations to: HRS §§ 91–7, 603–21.5,

held on [the Commission's] pastoral lot award plan prior to it being adopted on July 31, 1990, in accordance with [HRS] Chapter 91;

2) [a declaration] that pursuant to Sections 207(a), 219.2, and 222 of the HHCA the ... Commission has a duty to make sufficient land available to [the Aged Hawaiians] and all those like them desiring to commercially ranch on homestead land, in the order of priority established by the appropriate pastoral waiting list;

3) [a declaration] that [HAR §] 10–3–29 is void for vagueness because it provides no clear ascertainable standards by which a beneficiary may, prior to the adoption of a pastoral lot award plan, petition for, and receive upon a proper showing, pastoral land of sufficient size to commercially ranch.

4) [a declaration] that under the HHCA, the Commission is under a trust duty to immediately withdraw lands currently under general lease to private ranchers at Humuʻula, Piʻihonua, Kahua and other appropriate areas in order to make more land available to native Hawaiians on the pastoral waiting list;

5) [a declaration] that [Appellees] are violating 42 U.S.C. Section 1983 by (a) continuing to refuse [the Aged Hawaiians] and other pastoral lot applicants notice and an opportunity for a contested case hearing in advance of their decision to make pastoral lot awards; and (b) foreclosing any future opportunity for [the Aged Hawaiians] and other pastoral lot applicants to obtain a homestead lot award which can provide them the opportunity to become economically self-sufficient; and

6) [to permanently enjoin Appellees] from withholding the opportunity for beneficiaries on the pastoral waiting list to obtain pastoral homestead lots of sufficient

size to allow lessees a chance to earn a living by ranching commercially;

7) [to prospectively enjoin] the Commission from awarding any pastoral lot award to beneficiaries other than the September 1990 lot selectees until and unless it complies with the due process clauses of the U.S. and Hawaiʻi State Constitutions, and [HRS] Chapter 91;

8) [an order that Appellees]: (a) plan and develop for court approval a timetable to survey the needs of the appropriate beneficiaries on all pastoral wait lists statewide; and (b) make opportunities available to Plaintiff THE AGED HAWAIIANS, and those desiring economic self-sufficiency on a pastoral homestead lot, to obtain sufficient land of no more than 1,000 acres of unirrigated, or no more than 100 acres of irrigated, pasture land on the island of Hawaiʻi in the order set by the appropriate waiting list; [and]

9) [an award of] attorneys' fees pursuant to 42 U.S.C. § 1988.[12]

On the same date, the Appellees filed a motion to dismiss the complaint, or alternatively, for summary judgment.[13] Ultimately, on August 25, 1992, the third circuit court issued an order granting in part and denying in part the Appellees' motion to dismiss, finding that:

all of [the Aged Hawaiians'] claims in this case, with the exception of its claim under section 91–7, H.R.S., relating to the validity of section 10–3–29, [Hawaiʻi] Administrative Rules, are susceptible to the initial administrative resolution provided in the [Hawaiʻi] Administrative Procedures Act by way of a contested case hearing before the ... Commission. The court further finds that the [DHHL] has adopted formal procedures for contested case hearings established by agency rules and the [Aged

---

632–1, 661–1, 673–2(a) and (c), and 42 U.S.C. § 1983.

**12.** The Aged Hawaiians' request for relief was also made "as a matter of equity in light of [the Appellees'] 40–year unconscionable delay in awarding pastoral lots capable of providing beneficiaries on the 1952 Waimea Wait List with the opportunity to commercially ranch, and since there is no adequate remedy at law."

**13.** As summarized by the circuit court in a subsequent order dated March 2, 1993, the Appellees' January 15, 1992 "motion for dismissal [or in the alternative for summary judgment] was based on [the Aged Hawaiians'] failure to request a contested case hearing before filing their complaint and thus [the Aged Hawaiians] had failed to exhaust their administrative remedies before seeking relief pursuant to 42 U.S.C. § 1983 and H.R.S. Chapter 91."

Hawaiians have] not filed a written request for a contested case hearing, thus failing to follow administrative procedures.

Moreover, the court finds that [the Aged Hawaiians] still [have] open to [them] administrative procedures which provide an opportunity for an agency hearing and meet the statutory demand for specific procedures culminating in judicial review and that judicial review herein is not available under the Doctrine of Exhaustion of Administrative Remedies until the administrative process has run its course.

Based on the foregoing, ... (1) [the Commission and DHHL's] Motions with respect to ... the claim under [§ 91–7] relating to the validity of [HAR] section 10–3–29 ... are hereby DENIED; and, (2) [the Commission and DHHL's] Motions as to *all other claims* ... are hereby GRANTED and *all claims, with the exception of the claim under [§ 91–7], are hereby DISMISSED.*

(Citations omitted and emphasis added.)

On September 1, 1992, the circuit court issued a separate order granting in part and denying in part the Aged Hawaiians' fourth motion for summary judgment. In this order, the court found HAR § 10–3–29 void for vagueness, but reserved jurisdiction to consider "whether its subsequent declaratory ruling should require [the Commission] to include a procedure and timetable for the return of trust lands leased to non-beneficiaries." One week later, the Aged Hawaiians filed a motion seeking to alter or amend the court's August 25, 1992 judgment with respect to their § 1983 claims, citing *Felder v. Casey,* 474 U.S. 1037 (1985). On October 8, 1992, the circuit court issued an amended order that merely included the alternative ground of primary jurisdiction as an additional bar to the Aged Hawaiians' request for relief.

The Aged Hawaiians subsequently filed a motion on October 27, 1992 seeking certification of the court's October 8, 1992 amended order, under Hawai'i Rules of Civil Procedure (HRCP) Rule 54(b) (1991). The third circuit court granted the Aged Hawaiians' motion by order filed March 2, 1993. On March 29, 1993, the Aged Hawaiians timely served notice of the present appeal from the circuit court's October 8, 1992 order.

## II. *APPROPRIATENESS OF CERTIFICATION UNDER HRCP RULE 54(b).*

As a preliminary matter, the Appellees contend that the circuit court abused its discretion when it certified the October 8, 1992 order as final pursuant to HRCP Rule 54(b).[14] The Appellees assert that this order did not actually dismiss any claims. Because our jurisdiction to consider this appeal is based on the HRCP Rule 54(b) certification, we must address this issue at the outset. *See Bush v. Hawaiian Homes Comm'n,* 76 Hawai'i 128, 133, 870 P.2d 1272, 1277 (1994).

One of the "prerequisite[s] under [HRCP] Rule 54(b) is that at least one claim ... must be fully decided." *TBS Pacific, Inc. v. Tamura,* 5 Haw.App. 222, 228, 686 P.2d 37, 43, *reconsideration denied,* 5 Haw.App. 683, 753 P.2d 253, *aff'd mem. op.,* 67 Haw. 682, 744 P.2d 778, *reconsideration denied,* 67 Haw. 684, 744 P.2d 780 (1985). A fully decided but not final judgment, decree, or order becomes final and appealable ... "[u]pon the court's (1) determination that there is no just reason for delay and (2) direction for the entry of a final judgment pursuant to Rule 54(b)[.]" 5 Haw.App. at 228, 686 P.2d at 43. In the instant case, the October 8, 1992 order specifically dismissed all of the Aged Hawaiians' claims with the exception of their HRS § 91–7 claim. One of the dismissed claims involves the alleged deprivation of federal rights under 42 U.S.C. § 1983,[15] based on the

---

14. HRCP 54(b) provides in pertinent part:

When more than one claim for relief is presented in an action ... the court may direct the entry of final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment.

15. Title 42 U.S.C. § 1983 provides in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws,

Appellees' failure to provide the Aged Hawaiians with a reasonable opportunity to obtain a pastoral homestead award of sufficient size to support commercial ranching.[16] The remaining HRS § 91–7 claim involves a facial challenge to the validity of an agency rule, HAR § 10–3–29, on the ground that it sets forth no discernible standards for the Commission to follow in making homestead awards.[17]

■ Because the circuit court "made specific findings setting forth the reasons for its order" dismissing the Aged Hawaiians' federal claims, we "must give substantial deference to the lower court's discretion in determining whether an immediate appeal shall lie[.]" *Morrison–Knudsen Co. v. Archer,* 655 F.2d 962, 965 (9th Cir.1981). Moreover, we agree that the Aged Hawaiians' claims under § 1983 are "severable" from the remaining unadjudicated claim involving HRS § 91–7 and HAR § 10–3–29. *Cf. Morrison,* 655 F.2d at 966 (vacating certification under Federal Rules of Civil Procedure 54(b) because the dismissed claims were "inseverable, both legally and factually, from claims that remain unadjudicated").

## III. *DISCUSSION*

The Aged Hawaiians argue that the circuit court erred when it concluded that the doctrines of primary jurisdiction and exhaustion of administrative remedies bar their claims under 42 U.S.C. § 1983. The Appellees' response is multi-faceted:

1) certification was improvidently granted because the issues raised herein are related to the Aged Hawaiians' remaining claims under HRS § 91–7;

2) the issues are not ripe because the Aged Hawaiians have a meaningful chance to obtain contested case hearings;

3) abstention is proper under the primary jurisdiction doctrine where the Commission has discretion to determine whether homestead lands are required for leasing under HHCA § 207;

4) the Aged Hawaiians association is an improper institutional litigant;

5) the Aged Hawaiians have no private federal cause of action under § 1983 or, if such a claim exists, that there is insufficient evidence to support it; and

6) the Commission did not violate the Aged Hawaiians' due process rights because the Aged Hawaiians do not have a property interest in an "economic unit" award (and, in any event, there is no entitlement at all until an individual has "acquired ... specific benefits"); in the alternative, the Commission provided sufficient process in the circumstances.

The first argument was addressed previously, *see supra* section II, the next three are jurisdictional, *see infra* section III.A, and the last two focus on the merits of the Aged Hawaiians' claims. *See infra* sections III.B and III.C.

### A. *JURISDICTION AND JUSTICIABILITY*

The circuit court dismissed the Aged Hawaiians' federal claims on jurisdictional grounds. In its October 8, 1992 order, the

shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

16. In other words, the § 1983 element of the Aged Hawaiians' claim is that the Commissioners, under color of state law (the HHCA and HRS chapter 91), deprived their members of due process rights under the United States Constitution and their federal statutory rights under the HHCA, as incorporated by the Hawai'i Admission Act.

17. Although the court reserved jurisdiction to determine whether the Commission should provide for the return of trust lands leased to non-beneficiaries, that issue is distinct from the question whether Appellees must provide HHCA beneficiaries with an opportunity to apply for a pastoral homestead lot of sufficient size for commercial ranching. It is true that once land is set aside, its availability creates an "opportunity" in the abstract. However, even if the circuit court orders the return of these lands, it will not have determined whether the DHHL must, consistent with the HHCA and overlying trust principles, provide a procedure in its rules to consider granting pastoral homestead lots of sufficient size for commercial ranching. Thus, the remaining § 91–7 claim clearly does not encompass the Aged Hawaiians' due process claims under 42 U.S.C. § 1983.

court ruled that "judicial review ... is not available under the Doctrines of Primary Jurisdiction and Exhaustion of Administrative Remedies until the administrative process has run its course."

### 1. Exhaustion of Administrative Remedies and the Doctrine of Primary Jurisdiction

■ The United States Supreme Court expressly held, in *Patsy v. Florida Board of Regents,* 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1981), that "exhaustion of administrative remedies [is] not required as a prerequisite to bringing an action pursuant to § 1983." *Id.* at 516, 102 S.Ct. at 2568. It is "plain that Congress never intended that those injured by governmental wrongdoers could be required, as a condition of recovery, to submit their claims to the government responsible for their injuries." *Felder v. Casey,* 487 U.S. 131, 142, 108 S.Ct. 2302, 2308–09, 101 L.Ed.2d 123 (1988). Therefore, to the extent that the circuit court relied upon the doctrine of exhaustion, its decision was erroneous.

■ "[P]rimary jurisdiction is closely related to the doctrine of exhaustion of administrative remedies." B. Schwartz, *Administrative Law* § 8.30 (2d ed. 1984). The main difference, however, is that:

"Primary jurisdiction" ... applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body[.] *United States v. Western Pac. R.R.,* 352 U.S. 59, 63–64 [77 S.Ct. 161, 164–65, 1 L.Ed.2d 126] (1956). When this happens, "the judicial process is suspended pending referral of such issues to the ad-

ministrative body for its views." *Id.* at 64 [77 S.Ct. at 165.]

*Kona Old Hawaiian Trails Group v. Lyman,* 69 Haw. 81, 93, 734 P.2d 161, 168 (1987).[18] The primary jurisdiction doctrine is designed to promote uniformity and consistency in the regulatory process. *Western Pacific R.R.,* 352 U.S. at 64, 77 S.Ct. at 165. The doctrine does not apply where a pure question of law is at issue and technical matters calling for the special competence of the administrative expert are not involved. *Id.* at 66, 77 S.Ct. at 166. Primary jurisdiction also does not apply where the agency has already rendered its views. *Id.* at 69, 77 S.Ct. at 167.

■ The Appellees contend that we should apply the primary jurisdiction doctrine in the instant case because it is consistent with federal principles of abstention.[19] We are not persuaded. Deference to an agency is particularly inappropriate in cases like this one, in which the constitutionality of the agency's rules and procedures is challenged and questions are raised as to whether the agency has acted within the scope of its authority. The agency is not empowered to decide these questions of law. *Great Northern Ry. v. Merchants Elevator Co.,* 259 U.S. 285, 291, 42 S.Ct. 477, 335, 66 L.Ed. 943 (1922) (reaffirmed in *Western Pacific R.R.,* 352 U.S. at 69, 77 S.Ct. at 167). Furthermore, the Appellees have already used their specialized knowledge and expertise to construe the relevant statutory provisions. Accordingly, we hold that the circuit court erred in dismissing the Aged Hawaiians' claims based on the primary jurisdiction doctrine.

### 2. Finality/Ripeness

■ Notwithstanding our conclusion in section III.A.1, *supra,* the Appellees essen-

---

18. "Exhaustion," on the other hand comes into play "where a claim is cognizable in the first instance by an administrative agency alone; judicial interference is withheld until the administrative process has run its course." *Kona Old Hawaiian Trails,* 69 Haw. at 93, 734 P.2d at 168 (citing *Western Pacific R.R.,* 352 U.S. at 63, 77 S.Ct. at 164).

19. The Appellees argue that if this case had been brought in federal court, abstention under *Bur-*

ford v. Sun Oil Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424, *reh'g denied,* 320 U.S. 214, 63 S.Ct. 1442, 87 L.Ed. 1851 (1943), would apply. Consequently, the Appellees contend that application of the primary jurisdiction doctrine in state court would not impermissibly "adulterate or dilute the predominant feature of the federal right[.]" *Felder,* 487 U.S. at 148, 108 S.Ct. at 2312.

tially argue that the circuit court's decision was right for the wrong reason because additional procedures are available within the agency to address the Aged Hawaiians' claims for relief or other appropriate action. For example, now that leases have been issued, HAR § 10–3–25(a) provides that a "[l]essee of an agricultural or pastoral lot may apply for additional acreage of the same class." In other words, the Appellees urge that the Commission's rules "leave[ ] open the possibility" that additional pastoral acreage may eventually be made available to lessees, including members of the Aged Hawaiians, so that they can engage in commercially viable ranching activities. Thus, citing *Williamson County Regional Planning Commission v. Hamilton Bank,* 473 U.S. 172, 193–94, 105 S.Ct. 3108, 3120–21, 87 L.Ed.2d 126 (1985), the Appellees argue that the Aged Hawaiians' § 1983 has not yet ripened and the circuit court's order from which they have appealed is not "final."

In *Hamilton Bank,* a case involving a Tennessee planning commission's refusal to approve a proposed development project, the United States Supreme Court held that "the Commission's denial of approval ... is not a final, reviewable decision." *Id.* at 194, 105 S.Ct. at 3120. On the other hand,

> resort to the procedure for obtaining variances would [have] result[ed] in a conclusive determination by the Commission [as to] whether it would allow [Hamilton Bank] to develop the subdivision in the manner [it] proposed. The Commission's refusal to approve the preliminary plat does not determine that issue; it prevents [Hamilton Bank] from developing its subdivision without obtaining the necessary variances, but *leaves open the possibility* that [Hamilton Bank] may develop the subdivision according to its plat after obtaining the variances.

*Id.* at 193–94, 105 S.Ct. at 3120 (emphasis added). The Appellees essentially contend that the Aged Hawaiians should be barred from obtaining judicial review because HAR § 10–3–25(a) provides an opportunity for the agency to consider requests for additional pastoral land.

To the extent that the Appellees rely instead upon the Commission's discretionary power to grant a contested case hearing whenever it determines that one should be held, *see* HAR § 10–3–32(b), the Commission has already demonstrated its resistance to such hearings through its dealings with Akiona.

In any event, notwithstanding the Court's decision in *Hamilton Bank,* "[i]t is not at all clear that the ... reapplication requirement should apply to substantive due process claims ... [or that it should apply] in precisely the same manner as in the takings context." *Greenbriar, Ltd. v. City of Alabaster,* 881 F.2d 1570, 1576 n. 11 (11th Cir. 1989) (citing *Herrington v. Sonoma County,* 857 F.2d 567, 570 (9th Cir.1988), *amending* 834 F.2d 1488 (9th Cir.1987), *cert. denied, County of Sonoma v. Herrington,* 489 U.S. 1090, 109 S.Ct. 1557, 103 L.Ed.2d 860 (1989)), *reh'g denied,* 893 F.2d 346 (11th Cir.1989). In the context of regulatory takings claims, the reapplication requirement makes sense because it allows the court to decide whether the agency action went "too far[.]" *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922). Unless denial of an initial application somehow indicates that an agency will not permit any development, or any other "economically viable" use, the takings analysis cannot be performed until final administrative action has taken place. On the other hand, "the focus of due process analysis is ... *whether it was irrational* for [the Commission] to have [adopted the 1990 Plan in conjunction with HAR § 10–3–29] and to have applied it to [the Aged Hawaiians]." *Eide v. Sarasota County,* 908 F.2d 716, 724 n. 12 (11th Cir. 1990) (emphasis added) (quoting *Rogin v. Bensalem Township,* 616 F.2d 680, 689 (3rd Cir.1980), *cert. denied,* 450 U.S. 1029, 101 S.Ct. 1737, 68 L.Ed.2d 223 (1981)), *cert. denied,* 498 U.S. 1120, 111 S.Ct. 1073, 112 L.Ed.2d 1179 (1991). In the context of a due process claim, therefore, the Commission's decision to award subsistence pastoral lots to the Aged Hawaiians is reviewable without further action.

 Whether withdrawal of additional lands would jeopardize the HHCA revenue

base and, consequently, the interests of other HHCA beneficiaries, bears upon the rationality of the Commission's decision.[20] The existence of such issues should not, however, operate as a bar to the Aged Hawaiians' claims under the doctrine of finality. Thus, we hold that recourse to an agency's contested case procedures is not required as a prerequisite to an action for declaratory and injunctive relief of a prospective nature under 42 U.S.C. § 1983. Accordingly, we adopt the rationale of the Wyoming Supreme Court in *Rogers v. City of Cheyenne*, 747 P.2d 1137 (Wyo.1987), *appeal dismissed*, 485 U.S. 1017, 108 S.Ct. 1568, 99 L.Ed.2d 884 (1988), which held that federal justiciability standards are inapplicable in state court declaratory judgment actions involving matters of great public importance. *Id.* at 1138–39 (rejecting appellant's non-justiciability argument based on *Hamilton Bank, supra*).

■ Moreover, even if we were to employ the finality requirement as urged by the Appellees, the doctrine of futility, *see Mathews v. Eldridge*, 424 U.S. 319, 330, 96 S.Ct. 893, 900, 47 L.Ed.2d 18 (1976), would operate as an exception to the requirement of seeking additional agency action prior to obtaining judicial review. There is a cruel irony to the Appellees' claim that the Aged Hawaiians must wait for final agency action given the drawn-out history of homestead awards. When the Commission created the pastoral wait list in 1952, over thirty years after enactment of the HHCA, it determined that the native Hawaiians on that list were qualified pastoral homestead applicants. The list included current members of the Aged Hawaiians who, after waiting almost forty years on the list, selected pastoral homestead lots in 1990 rather than wait an additional undetermined period in the hope that the Commission would, of its own accord, reconsider the possibility of awarding larger lots sufficient

for commercial ranching.[21] Now it appears that those who seek additional acreage must go to the bottom of the waiting list. HAR §§ 10–3–7, 10–3–24(a) & 10–3–25(b).[22]

The Appellees readily acknowledge that they have limited resources to make awards to beneficiaries already on the waiting list. Moreover, the record in this case reflects that the pastoral waiting list for the island of Hawai'i currently contains over 450 names, and in the past forty years less than 200 awards have been made. There is no indication in the record that any additional land will be made "available" in the near future for homestead awards. Finally, the record indicates that the members of the Aged Hawaiians are all over seventy years old. Under these circumstances, requiring the Aged Hawaiians to wait at the bottom of the waiting list for additional acreage would be clearly futile.

### 3. Standing

An alternative jurisdictional challenge proffered by the Appellees is that the Aged Hawaiians association does not have standing because the group's claim is not redressable. Appellees claim that resolution of the issues raised in this case requires individualized assessment of each member's ability to engage in commercial ranching. The Aged Hawaiians respond that our state courts are not bound by the federal "case or controversy" requirement when entertaining claims brought under § 1983.

■ The Aged Hawaiians' due process rights are indeed capable of being redressed without inquiring into the ability of each of its members to engage in commercial ranching. In *Pele Defense Fund v. Paty*, 73 Haw. 578, 837 P.2d 1247 (1992), we rejected a similar argument by the State based upon the "'generalized' injuries" associated with

---

20. This issue is related, in part, to the factual dispute concerning the feasibility of commercial ranching on lots of less than 1,000 acres. *See supra* note 8.

21. If Akiona had passed up this opportunity to select a lot, he risked the possibility of dying without receiving an award. *See supra* notes 4 and 9.

22. HAR § 10–3–25(b) provides that a lessee seeking additional pastoral acreage "shall be contacted for an award in accordance with section 10–3–24(a)." HAR § 10–3–24(a), in turn, provides that such an applicant "shall be contacted in accordance with section 10–3–7" "[w]hen ... pastoral lots become available for award[.]" Finally, HAR § 10–3–7(b) provides that the DHHL "shall give preference to an applicant who is not a lessee, or whose spouse is not a lessee."

an alleged "breach of trust responsibilities ... codified in federal and state law and incorporated into the Hawaii Constitution." 73 Haw. at 593–94 & n. 9, 837 P.2d at 1258 & n. 9. Application of this principle to the instant case is also consistent with *Hunt v. Washington Apple Advertising Commission,* 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977), which held that where "the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured." 432 U.S. at 343, 97 S.Ct. at 2441 (citation omitted). Furthermore, the Appellees concede that at least one member of the association seeks more land for ranching activities. State law justiciability policies must be applied as the "needs of justice" require. *Life of the Land v. Land Use Comm'n,* 63 Haw. 166, 176, 623 P.2d 431, 439 (1981).

Accordingly, we hold that the Aged Hawaiians have standing to pursue their claims in the instant case.

### B. SECTION 1983 BREACH OF TRUST CLAIM

■■■ In order to maintain a claim under § 1983, the Aged Hawaiians must be able to prove that (1) a person acting under color of state law, (2) subjected them, or is threatening to subject them, to the deprivation of a right under the United States Constitution or other federal law. *Makanui v. Board of Educ.,* 6 Haw.App. 397, 404, 721 P.2d 165, 170 (1986). The individual commissioners are clearly persons who were acting under color of state law. The dispute in this case, therefore, focuses on the question of enforceability under § 1983.

The Aged Hawaiians claim that the Appellees have deprived them of their federal rights under the HHCA and the Admission Act, as well as the due process clause of the Fourteenth amendment to the United States Constitution. We shall address the constitutional due process issue separately. *See infra* section III.C. The Appellees essentially

contend that the Aged Hawaiians have failed to state a claim cognizable under § 1983, arguing that: (1) the HHCA is a state law and not a federal law; and (2) the United States Supreme Court's decision in *Suter v. Artist M.,* 503 U.S. 347, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992), undermines the existence of a private right to sue under § 1983 for the enforcement of breach of trust claims under § 5(f) of the Admission Act.

### 1. Claims based on the HHCA are matters of federal law

■■■ First, we observe that the HHCA was initially enacted by Congress. When Hawai'i gained admission to the Union, the newly formed state accepted responsibility for the management and operations of the Hawaiian home lands program as a "compact" with the United States. Haw. Const., art. XII, § 2; *Keaukaha–Panaewa Community Ass'n v. Hawaiian Homes Comm'n (Keaukaha II),* 739 F.2d 1467, 1469 (9th Cir.1984); *Ahuna v. Department of Hawaiian Home Lands,* 64 Haw. 327, 337, 640 P.2d 1161, 1168 (1982). As the Ninth Circuit stated almost a decade ago:

Congress' role in the formation of a compact between the United States and a State is at least as great as Congress' role in approving a compact between two States. In addition, federal law is "an essential element" of a suit that charges a violation of a compact incorporating "the spirit of the [HHCA] looking to the continuance of the Hawaiian homes projects." Haw. Const., art. XII, § 2; art. XII, § 4; art. XVI, § 7; *see Keaukaha II,* 739 F.2d at 1472.

*Price v. State of Hawaii,* 764 F.2d 623, 629 (9th Cir.1985), *cert. denied, Hou Hawaiians v. Hawaii,* 474 U.S. 1055, 106 S.Ct. 793, 88 L.Ed.2d 771, *reh'g denied,* 475 U.S. 1091, 106 S.Ct. 1482, 89 L.Ed.2d 736 (1986). A federal-state compact, like an interstate compact, is enforceable as a matter of federal law because it derives its powers from Congress and can be amended or repealed only with the consent of Congress.[23] Although the

---

**23.** We recognize that under § 4 of the Admission Act, Congress gave the State power to amend (through its constitution or State legislation) certain limited provisions of the HHCA *without* congressional consent, including: provisions relating to administration (for example, §§ 202, 213,

management and disposition of Hawaiian home lands has been turned over to the State in § 4 of the Admission Act, "Congress enacted ... a federal public trust, which by its nature creates a federally enforceable right for its beneficiaries to maintain an action against the trustee[24] in breach of the trust." *Price v. Akaka (Akaka II )*, 3 F.3d 1220, 1225 (9th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1645, 128 L.Ed.2d 365 (1994); *see also Price v. State of Hawaii,* 764 F.2d at 629; *Keaukaha II,* 739 F.2d at 1471–72; *Ahia v. Department of Transp.,* 69 Haw. 538, 555, 751 P.2d 81, 91 (1988). Furthermore, as the Ninth Circuit has stated, the " 'compact' between [Hawai'i] and the United States *strictly limits the manner in which [Hawai'i] may manage the homelands* [.]" *Price v. Akaka (Akaka I )*, 928 F.2d 824, 826 n. 1 (9th Cir.1990) (emphasis added), *cert. denied,* 502 U.S. 967, 112 S.Ct. 436, 116 L.Ed.2d 455 (1991); *accord Akaka II,* 3 F.3d at 1222 n. 2.

### 2. Enforceability of the § 1983 claim

■ Second, we shall consider the Appellees' argument that *Suter* is directly at odds with *Keaukaha II* and other federal cases that allow § 1983 enforcement via § 5(f) of the Admission Act. The Appellees essentially contend that *Suter* supersedes application of the following two-part framework traditionally applied when analyzing § 1983 enforceability issues:

First, the plaintiff must assert the violation of a federal right.... In deciding whether a federal right has been violated, we have considered whether the provision in question creates obligations binding on the governmental unit or rather does no more than express a congressional preference for certain kinds of treatment. The interest the plaintiff asserts must not be too vague and amorphous to be beyond the competence of the judiciary to enforce. We have also asked whether the provision

in question was intended to benefit the putative plaintiff.

Second, even when the plaintiff has asserted a federal right, the defendant may show that Congress specifically foreclosed a remedy under § 1983, by providing a comprehensive enforcement mechanism for protection of a federal right[.] The availability of administrative mechanisms to protect the plaintiff's interests is not necessarily sufficient to demonstrate that Congress intended to foreclose a § 1983 remedy. Rather the statutory framework must be such that allowing a plaintiff to bring a § 1983 action would be inconsistent with Congress' carefully tailored scheme. The burden to demonstrate that Congress has expressly withdrawn the remedy is on the defendant. We do not lightly conclude that Congress intended to preclude reliance on § 1983 as a remedy for the deprivation of a federally secured right.

*Golden Gate Transit Corp. v. City of Los Angeles,* 493 U.S. 103, 106–07, 110 S.Ct. 444, 448–49, 107 L.Ed.2d 420 (1989) (internal quotations and citations omitted). *See also Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990); *Wright v. Roanoke Redevelopment & Housing Auth.,* 479 U.S. 418, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987); *Smith v. Robinson,* 468 U.S. 992, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984); *Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n,* 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981); *Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981); *Maine v. Thiboutot,* 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980).

In *Suter,* the Court held that the Adoption Assistance and Child Welfare Act (AACWA) does not create rights enforceable in an action under § 1983 because such rights are not "unambiguously conferred" by the AACWA. 503 U.S. at ——–——, 112 S.Ct.

---

219, 220, 222, 224 and 225); provisions relating to the powers and duties of non-administrative officers, such as §§ 204(2), 206 and 212. The State can also, through the same procedures, increase the benefits to lessees of Hawaiian home lands. 1 Haw.Rev.Stat. 86, 86–87 (1985) (Admission Act, 1959, § 4); *see also* Haw. Const. art. XII, § 3.

24. The Commission "is the specific state entity obliged to implement [the Hawaiian home lands trust] on behalf of eligible native Hawaiians." *Ahuna,* 64 Haw. at 338, 640 P.2d at 1168.

at 1367–68. The AACWA established a federal reimbursement program for certain expenses incurred by States in administering foster care and adoption services. In order to qualify for reimbursement, States are obligated to submit a plan to the Secretary of Health and Human Services for approval. In order to obtain approval, this plan must provide, inter alia, that the State will undertake "reasonable efforts" to prevent removal of children from their homes and to facilitate reunification of families where removal has occurred. The Secretary has only limited power to enforce this requirement once a State's plan is approved; therefore, within broad limits, compliance with the term "reasonable efforts" is "left up to the State." *Id.* at ——, 112 S.Ct. at 1368.

In determining that the hortatory requirements of the AACWA did not establish federal rights actionable under § 1983, the Court in *Suter* distinguished an earlier case that construed the term "reasonable" in the context of a different statute. *Id.* at ——, 112 S.Ct. at 1367–68 (citing *Wilder, supra,* which involved Medicaid legislation). The Court in *Wilder* had examined the relevant legislative enactment and found detailed factors that Congress required the States to consider in determining their individual methods for calculating "reasonable and adequate" rates. 496 U.S. at 519 n. 17, 110 S.Ct. at 2522 n. 17. Construing the term "reasonable" in light of the legislation as a whole, the Court found that the statutory provisions created a right enforceable under § 1983. *Id.* at 524, 110 S.Ct. at 2525. Notwithstanding the Court's efforts to distinguish *Wilder* in the *Suter* opinion, it did not expressly or implicitly overrule the traditional § 1983 enforceability framework.

In *Arkansas Medical Society, Inc. v. Reynolds,* 6 F.3d 519 (8th Cir.1993), the United States Court of Appeals for the Eighth Circuit specifically considered *Suter's* impact on the traditional framework for analyzing § 1983 enforceability issues. The Eighth Circuit concluded that the analysis in *Suter* can be harmonized with the traditional

framework. 6 F.3d at 525. Furthermore, none of the other cases cited by the Appellees holds that the traditional framework is no longer valid. *See Stowell v. Ives,* 976 F.2d 65, 68 (1st Cir.1992) (applying the traditional framework "as reconfigured by the neoteric principles announced in *Suter* ").[25]

*Suter* urges careful scrutiny of the exact legislation at issue, *see* 503 U.S. at ——, 112 S.Ct. at 1367 (citing *Wilder,* 496 U.S. at 509, 110 S.Ct. at 2517, and *Wright,* 479 U.S. at 423, 107 S.Ct. at 770), and merely reemphasizes the point in *Pennhurst, supra,* that legislation enacted pursuant to Congress's spending power must be imposed unambiguously. 503 U.S. at ——, 112 S.Ct. at 1366 (citing *Pennhurst,* 451 U.S. at 17, 24, 101 S.Ct. at 1539–40, 1543). Bearing in mind these considerations, the Eighth Circuit applied the traditional framework to its analysis of the same statute involved in *Wilder, supra,* and concluded that Medicaid recipients may legitimately enforce the equal access provision of the AACWA via § 1983. *See Arkansas Medical,* 6 F.3d at 523–28. Like the Eighth Circuit's analysis in *Arkansas Medical,* our inquiry into the relevant statutes in the instant case is also simplified by prior judicial decisions holding that breaches of the Homelands trust can be enforced by native Hawaiian beneficiaries under § 1983.

### a.

■■■■ The initial factor to consider is whether the enactments at issue create a binding obligation or merely express congressional preference for a certain kind of conduct. *Suter,* 503 U.S. at ——, 112 S.Ct. at 1366–67; *Golden State,* 493 U.S. at 106, 110 S.Ct. at 448–49. Essentially, the Appellees contend that the requirements included in the HHCA and the Admission Act are merely hortatory and not mandatory. Specifically, the Appellees claim that "*Suter* is directly at odds with *Keaukaha II,* and its progeny, for § 5(f) does not 'unambiguously confer' upon native Hawaiian beneficiaries 'a right to enforce' the Admission Act (and, a

---

**25.** The other case cited by the Appellees, *Resident Council of Allen Parkway Village v. HUD,* 980 F.2d 1043 (5th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 75, 126 L.Ed.2d 43 (1993), did not

decide the question whether *Suter* "effected a sea [of] change in the Court's approach to § 1983," because the legislation in question did not pass the traditional two-part test. 980 F.2d at 1052.

fortiori, the HHCA).'' Nevertheless, in *Akaka II*, the Ninth Circuit held that its:

> decisions in *Keaukaha II*, 739 F.2d at 1472, and *Akaka I*, holding that beneficiaries of the public trust created by Congress may bring a § 1983 claim[,] *are consistent with the Supreme Court's decision in Suter.* Congress enacted the Admission Act, a federal public trust, which by its nature creates a federally enforceable right for its beneficiaries to maintain an action against the trustee in breach of the trust.

*Akaka II*, 3 F.3d at 1225 (emphasis added). Furthermore, in *Pele Defense Fund v. Paty, supra,* we expressly recognized that allowing a private right of action under § 1983 for suits alleging a breach of trust is ''consistent with the common law of trusts, in which one whose status as a beneficiary depends on the discretion of the trustee nevertheless may sue to compel the trustee to abide by the terms of the trust.'' 73 Haw. at 592 n. 8, 837 P.2d at 1257 n. 8 (citing *Akaka I*, 928 F.2d at 826–27); *see also Akaka II*, 3 F.3d at 1224–25 (citing Restatement (Second) Trusts, §§ 199 & 200 comment).[26] Accordingly, we conclude that the HHCA and the Admission Act impose a binding obligation on the State.

### b.

Another factor to consider is whether the statute's language is too vague and amorphous to enforce via § 1983. *Suter*, 503 U.S. at ——, 112 S.Ct. at 1366–67; *Golden State*, 493 U.S. at 106, 110 S.Ct. at 448–49. The Appellees note that ''[a]s in *Suter*, Congress has 'left up to the State' how to comply with Admission Act sections 4 and 5(f), subject only to enforcement by the United States.'' The Adoption Assistance and Child Welfare Act (AACWA) analyzed in *Suter* ''only [went] so far as to ensure that the State have a *plan* approved by the Secretary [of Health and Human Services].'' 503 U.S. at ——, 112

S.Ct. at 1367 (emphasis added). Consequently, the AACWA confers considerable discretion upon the states to provide the particular details, based on the broad features outlined in the statute. 503 U.S. at ——, 112 S.Ct. at 1369. However, the simple fact that Congress has granted considerable discretion regarding the implementation of statutory requirements is not enough to preclude a finding of judicial enforceability. *See, e.g., Wilder,* 496 U.S. at 519–20, 110 S.Ct. at 2522; *Wright*, 479 U.S. at 431–32, 107 S.Ct. at 774–75; *Arkansas Medical,* 6 F.3d at 527. Notwithstanding the State's discretionary authority under section 5(f) of the Admission Act—to manage and dispose of lands, proceeds and income generated from the Home land trust ''in such manner as the constitution and laws of said State may provide''—section 4 of the Admission Act establishes a ''compact'' between the United States and Hawai'i that ''strictly limits the manner in which [the State] may manage the homelands[.]'' *Akaka I,* 928 F.2d at 826 n. 1; *accord Akaka II,* 3 F.3d at 1222 n. 2. Therefore, the statutory obligations in the instant case are readily distinguishable from the mere requirement of a secretarially-approved ''plan'' in *Suter.*

Under HHCA § 207(a), qualified native Hawaiian beneficiaries are entitled to lease up to 1,000 acres of unirrigated pastoral land, or up to 100 acres of irrigated pastoral land. Furthermore, HHCA § 207(b) mandates that the DHHL ''*shall, whenever tracts are available,* enter into such a lease with any applicant who, in the opinion of the department, is qualified to perform the conditions of such lease.'' 1 Haw.Rev.Stat. at 183 (emphasis added). In addition, HHCA § 204(a)(2) provides that available lands ''*not required* for leasing under section 207(a)'' may be leased to members of the general public. 1 Haw.Rev.Stat. at 49 (emphasis added).[27] We conclude that the judiciary is

---

**26.** Trust beneficiaries have the right to (a) compel the performance of trust duties, (b) enjoin the commission of a breach of trust by the trustee, and (c) compel the trustee to redress a breach of trust. *Akaka II,* 3 F.3d at 1224–25. With respect to claims against state officials under § 1983, however, claimants cannot recover money damages or the equivalent for past violations of law;

nevertheless, relief that is ''prospective in nature may be allowed regardless of the state's sovereign immunity.'' *Pele Defense Fund v. Paty,* 73 Haw. at 609, 837 P.2d at 1266. In the instant case, therefore, the Aged Hawaiians' claims are properly formulated.

**27.** The Appellees maintain that ''the Commission has a 'special' statutory competence in ascertain-

authorized to enforce the relevant terms of the Admission Act and the HHCA in the instant case.

### c.

The final factor to consider is statutory intent to benefit the claimant. *Golden Gate,* 493 U.S. at 106, 110 S.Ct. at 448. Native Hawaiians are clearly intended beneficiaries of the public trust established in the HHCA and the Admission Act. Furthermore, because the Aged Hawaiians merely seek prospective relief, it is reasonable to presume that "the remedy, if granted, will inure to the benefit of those members of the association actually injured." *Hunt,* 432 U.S. at 343, 97 S.Ct. at 2441.

### 3. The relevant statutes do not preclude § 1983 actions

 Under the second prong of the traditional framework for § 1983 enforceability issues, an otherwise viable § 1983 claim may nevertheless be foreclosed if such an action is inconsistent with a comprehensive and carefully tailored remedial scheme constructed by Congress. *Golden Gate,* 493 U.S. at 106–07, 110 S.Ct. at 448–49. In the instant case, the Appellees bear the burden of showing that enforcement under § 1983 would be inconsistent with the remedial provisions of the Admission Act. In *Wilder, supra,* the United States Supreme Court noted that "[o]n only two occasions have we found a remedial scheme established by Congress sufficient to displace the remedy provided in § 1983." 496 U.S. at 521, 110 S.Ct. at 2523. The federal statutes involved in those cases were: (1) the Education of the Handicapped Act, *Smith v. Robinson,* 468 U.S. at 1010–11, 104 S.Ct. at 3467–68; and (2) the Federal Water Pollution Control Act, and the Marine Protection, Research and

Sanctuaries Act. *National Sea Clammers Ass'n,* 453 U.S. at 11, 101 S.Ct. at 2621–22. Each of these enactments contained elaborate provisions authorizing numerous specific statutory remedies, thereby demonstrating a congressional intent to preclude an alternative remedy under § 1983. By contrast, the only remedy expressly authorized by the HHCA under the Admission Act is suit by the United States; there is no elaborate remedial scheme that the Aged Hawaiians could pursue to enforce their rights. *Cf. Han v. United States Dep't of Justice,* 45 F.3d 333, 339–340 (9th Cir.1995) (affirming dismissal of Hawaiian homelands lessees' challenge to the Commission's act of authorizing third party agreements). Thus, the Appellees have not shown that the Admission Act and the HHCA contain sufficiently comprehensive remedial devices that would justify a conclusion that Congress intended to foreclose § 1983 actions.

### 4. Application to the instant case

Returning to the first prong of the traditional framework for determining § 1983 enforceability issues, as explicated in *Suter,* and having resolved factors (a), (b), and (c) in the Aged Hawaiians' favor, the question remains whether these claimants met their burden of establishing the violation of a federal right. Notwithstanding a 1985 amendment to the HHCA that eliminated the minimum allowable acreage for a pastoral homestead lot,[28] the Aged Hawaiians claim that the Commission may not simply award lots of any size it chooses because HHCA § 207(a) must be construed in light of the Commission's duty to promote the rehabilitation of native Hawaiians. *See Ahuna,* 64 Haw. at 336, 640 P.2d at 1167 (mentioning the "fiduciary obligation to place beneficiaries of the HHCA ... on the land to the fullest extent possible"). By amending HHCA § 207(a), the

---

ing whether lands are 'required for leasing' under § 207 of the Act, or may be used for general leasing purposes to facilitate other statutory goals[,]" and therefore, dismissal is appropriate under the primary jurisdiction doctrine. As noted previously, however, *see supra* section III.A.2, we need not wait for further decision-making because the agency already made a determination of availability with respect to the lands covered by its 1990 Plan.

**28.** Congress gave its consent, as required by § 4 of the Admission Act, to this and other HHCA amendments in 1986. *See* Public Law 99–557 (Oct. 27, 1986). Previously, HHCA § 207(a) permitted pastoral lot awards in the following ranges: 100–500 acres of first-class pastoral lands, 250–1000 acres of second-class pastoral lands, and 40–100 acres of irrigated pastoral land.

legislature "intend[ed] merely to remove the minimum acreage now specified by law ... [and] retain the present statutory ceiling on the maximum acreage that can be awarded in the case of irrigated pastoral lands[.]" Hse. Stand.Comm.Rep. No. 873, in 1985 House Journal, at 1414; *see also* Sen. Stand.Comm.Rep. No. 480, in 1985 Senate Journal, at 1087–88.

It is true that the legislative history of the HHCA acknowledges DHHL's limited resources and the prohibitive cost of essential site improvements; however, the legislature also expressed its belief that "many existing pastoral leases are *too large* for an individual ranch operation, thereby forcing many homesteaders to enter into grazing agreements with other ranchers, [and that reducing] the ... size of pastoral lots would allow homesteaders to be more independent in their land use[.]" Hse.Stand.Comm.Rep. No. 873, in 1985 House Journal, at 1414 (emphasis added); *see also* Sen.Stand.Comm.Rep. No. 480, in 1985 Senate Journal, at 1088. The legislature also believed that the use of "intensive ranching techniques [would] increase the carrying capacity of a given unit of pasture." Hse.Stand.Comm.Rep. No. 873, in 1985 House Journal, at 1414; *see also* Sen. Stand.Comm.Rep. No. 480, in 1985 Senate Journal, at 1088 ("intensive ranching techniques can now increase the carrying capacity of given acreages two or three times"). Construing this legislative history as a whole, we cannot infer that the legislature intended to deny qualified homesteaders the opportunity to pursue commercial ranching activities.

The Commission and DHHL adopted the subsistence ranching policy in the 1990 Plan based on the implicit conclusion that awarding commercially viable ranching leases would amount to an excessive conferral of benefits on a small minority of beneficiaries at great costs to the larger group, which has been patiently waiting to receive benefits under the Act. As in *Ahuna*, however, the Commissioners in the instant case "have failed to sufficiently demonstrate that they considered the interests of all beneficiaries." 64 Haw. at 340, 640 P.2d at 1170.

In ruling on a motion for summary judgment, the evidence must be "viewed in the light most favorable to the nonmoving party." *State Farm Mutual Auto. Ins. Co. v. Fermahin,* 73 Haw. 552, 555, 836 P.2d 1074, 1076 (1992). Accordingly, the record in the instant case contains allegations supported by the following facts, which could sustain a finding that the Commission has not treated beneficiaries who seek commercial ranching opportunities fairly: (1) the agency adopted its 1990 Plan without consulting obviously interested parties, despite repeated requests for information by the Aged Hawaiians; (2) the 100 and 200 acre lots included in the Commission's 1990 Plan are clearly not "economic units," but merely represent a "response" to the interests of aspiring commercial ranchers—despite the Commission's unanimous vote to "address the concerns of those native Hawaiians who have the capability to commercial ranch, [so] that [they can] be given the opportunity to do so[,] and [to require] that the [DHHL] present to the [Commission] a proposal to effectuate commercial ranching"; (3) the Commission has still not followed up on this requirement by demanding a commercial ranching proposal from DHHL; and (4) despite the recommendations of a Federal–State Task Force in 1983, the Commission did not make individualized determinations of the applicants' need for pastoral land, or their capacity to engage in such endeavors, before implementing its 1990 Plan. The Aged Hawaiians are not merely relying upon conclusory assertions. *See Briggs v. Hotel Corp. of the Pac.,* 73 Haw. 276, 281 n. 5, 831 P.2d 1335, 1339 n. 5 (1992). At the very least, there are genuine issues of material fact as to whether commercial ranching is feasible on lots of less than 1,000 acres. *See supra* note 8. Consequently, summary judgment should not have been granted in favor of the Appellees.

Based on the foregoing analysis, we hold that: (1) the Aged Hawaiians have asserted a viable claim under § 1983 alleging a breach of trust duties by the Appellees under the HHCA (via the Admission Act); and (2) the circuit court erroneously granted summary judgment dismissing the claim. Should the circuit court find a violation of the Aged Hawaiians' federal rights under the HHCA and the Admission Act on remand, an appro-

priate form of relief would be an injunction preventing the award of additional pastoral land to beneficiaries other than the 1990 selectees until the Commission at least considers applications by any among this group who desire additional pastoral acreage.

## C. *SECTION 1983 CONSTITUTIONAL DUE PROCESS CLAIM*

The Appellees' basic contention in this case is that the Commission's "resource allocation [efforts] ... meet[ ] the Admission Act's requirement that the Home Lands be devoted to ... 'the betterment of the conditions of native Hawaiians[,]' ... even though others would benefit." The Appellees argue further that the individual Commissioners acted within their discretionary authority because § 4 of the Admission Act, which incorporates the HHCA, does not compel maximum distribution. In other words, the Appellees claim that the Aged Hawaiians have received all the process that is due. The Aged Hawaiians, on the other hand, essentially seek a declaration of their right as trust beneficiaries to a hearing at which they will have the opportunity to demonstrate the appropriateness of an economic unit award in conjunction with an existing entitlement under the HHCA. This procedural due process issue is slightly different from the claim based on the alleged violation of the HHCA and the Admission Act.

■■■ A fundamental requirement for a successful due process claim is the deprivation of a property interest. *Pele Defense Fund v. Puna Geothermal Venture*, 77 Hawai'i 64, 68, 881 P.2d 1210, 1214 (1994). Notwithstanding the Appellees' arguments to the contrary, qualified HHCA beneficiaries on homestead waiting lists are entitled to homestead awards. A "property interest" is not limited to "the traditional 'right-privilege' distinction[,] ... [but also includes] benefit[s] which one is entitled to receive by statute[.]" *Aguiar v. Hawaii Housing Authority*, 55 Haw. 478, 496, 522 P.2d 1255, 1267 (1974);

*see also Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1976). In the instant case, the Aged Hawaiians' claims are based upon valid property interests; therefore, they are not asserting a claim based on the mere "expectation of receiving process ... without more[.]"[29] *Olim v. Wakinekona*, 461 U.S. 238, 250 n. 12, 103 S.Ct. 1741, 1748 n. 12, 75 L.Ed.2d 813 (1983); *see also Roth*, 408 U.S. at 577–78, 92 S.Ct. at 2709–10 (citing *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), and noting that the relevant property interest is "created and defined by statutory terms[,]" the applicability of which the claimants failed to establish in that case).

■■■ The scope of the property interests held by HHCA beneficiaries prior to their selection of homestead lots, however, requires further analysis. Although HHCA beneficiaries are not necessarily entitled to "economic units" upon which they can engage in commercial ranching, they are entitled to be placed on the land to the fullest extent possible. *See* discussion *supra* section III.B, concerning the 1985 amendment to HHCA § 207(a). More precisely, the Commission may not arbitrarily preclude the award of an "economic unit."

The HHCA authorizes the Commission and DHHL to: (1) "assist the lessees in obtaining *maximum utilization* of the leased lands, including taking steps necessary to develop these lands for their *highest and best use commensurate with the purposes for which the land is being leased as provided in Section 207[,]*" 1 Haw.Rev.Stat. 167, 201 (1985) (HHCA, 1920, § 219.1) (emphasis added); (2) undertake and carry out general water and development projects, 1 Haw.Rev.Stat. 39, 59–60 (Supp.1992) (HHCA, as amended, § 220); (3) provide loans for the purchase of livestock and equipment, 1 Haw.Rev.Stat. 39, 56–57 (Supp.1992) (HHCA, as amended, § 214); (4) provide agricultural experts and sufficient water for the watering of

---

**29.** The instant case is unlike the claim in *Bush, supra*. First, the Aged Hawaiians do not invoke this court's jurisdiction under HRS § 91–14. Second, the proceedings at issue here involve agency decisions that effectively determined the scope of the Aged Hawaiians' existing entitle-

ment. Approval of the third party agreements in *Bush*, on the other hand, did not constitute action affecting any "property interest [under] the relevant sections of the HHCA and the HAR." *Bush*, 76 Hawai'i at 136, 870 P.2d at 1280.

livestock, 1 Haw.Rev.Stat. 167, 200 (1985) (HHCA, 1920, § 219); 1 Haw.Rev.Stat. 167, 202–203 (1985) and 1 Haw.Rev.Stat. 39, 62–63 (Supp.1992) (HHCA, 1920 and as amended, § 221); (5) establish "a permanent land base for the benefit and use of native Hawaiians, upon which they may ... ranch[,]" 1 Haw. Rev.Stat. 39 (Supp.1992) (HHCA, as provisionally amended, § 101),[30] and (6) provide "financial support and technical assistance to native Hawaiian beneficiaries so that by pursuing strategies to enhance economic self-sufficiency ... the traditions, culture and quality of life of native Hawaiians shall be forever self-sustaining." *Id.* These provisions contemplate and seek to promote full-time ranching, farming and aquaculture by native Hawaiians on homestead lots.

Although less intense ranching activities of this nature designed to supplement homesteaders' incomes are also appropriate under the HHCA, the Appellees must give adequate consideration to applications for homestead awards of a size sufficient for commercial ranching. In the instant case, it appears that some beneficiaries were pressured into accepting smaller pastoral lots without sufficient opportunity to present their case for a larger lot award. These homesteaders must now wait for (1) additional "available lands" to be withdrawn from general leasing, and (2) their names to rise up from the bottom of the new waiting list. The process may not take forty years this time around, but the agency's previous course of action suggests that the Aged Hawaiians' goal of "self-sufficiency" through commercial ranching will not be given serious consideration.

▮▮▮▮ Once a claimant demonstrates a sufficient property interest, the court must balance the following factors to determine the specific procedures required to satisfy

due process guaranteed by the fourteenth amendment:

> (1) the private interest which will be affected; (2) the risk of an erroneous deprivation of such interest through the procedures actually used, and the probable value, if any, of additional or alternative procedural safeguards; and (3) the governmental interest, including the burden that additional procedural safeguards would entail.

*Kernan v. Tanaka,* 75 Haw. 1, 22–23, 856 P.2d 1207, 1219–20 (1993) (citing *Mathews v. Eldridge,* 424 U.S. at 335, 96 S.Ct. at 903), *cert. denied,* —— U.S. ——, 114 S.Ct. 1070, 127 L.Ed.2d 389 (1994). As the circuit court held in its September 4, 1990 order denying the Aged Hawaiians' request for a preliminary injunction, it is indeed a "close question" whether the Aged Hawaiians' asserted interests should prevail under this test. Nevertheless, the balance of interests is tilted in favor of the private interests based on the procedural infirmities that have already taken place, including: (1) attempted implementation of the "ten premises" as "internal management" measures outside the rule making process; (2) promulgation of vague rules; (3) failure to provide adequate notice or opportunity to be heard in conjunction with the development of the 1990 Plan; (4) awards of 100 and 200 acre lots that do not serve any conceivable statutory purpose; and (5) denial of contested case hearing requests to Akiona prior to the award of homestead lots. Our conclusion is bolstered by the absence of reasonable alternatives for obtaining relief. *Cf. Medeiros v. Hawaii County Planning Comm'n,* 8 Haw.App. 183, 797 P.2d 59, *reconsideration denied,* 8 Haw.App. 661, 868 P.2d 466 (1990).[31] Additional or alternative

---

**30.** Section 101, the "Purpose" clause, was enacted by the Hawai'i legislature in 1990. 1990 Haw.Sess.L.Act 349, § 1 at 1075–76. This amendment is subject to the consent of Congress. *See* 1 Haw.Rev.Stat. 86, 86 (1985) (Admission Act, 1959, § 4). Nevertheless, this language is consistent with judicial decisions based upon the legislative history of the HHCA. One of the HHCA's authors, Senator John H. Wise, specifically stated that the HHCA was intended to "rehabilitate" native Hawaiians by giving them "lands to live on" and "the mode of living that their ancestors were accustomed to" in order to

"work[ ] out their own salvation." *See Ahuna,* 64 Haw. at 336 & n. 10, 640 P.2d at 1167 & n. 10 (citing H.R.Rep. No. 839, 66th Cong., 2d Sess. 4 (1920)); *see also Report of the Federal–State Task Force on the [HHCA]* 14 (August 1983).

**31.** In *Medeiros,* the Intermediate Court of Appeals had "no doubt that [contested case hearings] would have considerably burdened the process[,]" but noted further that the claimants (unlike the Aged Hawaiians) had recourse to the "reasonable alternative" of mediation, which

procedural safeguards would be of considerable value in these circumstances. Accordingly, we hold that HHCA beneficiaries on the pastoral waiting list are entitled to contested case hearings at which the Commission must at least consider their applications for pastoral lot awards of sufficient acreage (within the statutory limits) for commercial ranching activities.

## IV. *CONCLUSION*

The doctrines of exhaustion and primary jurisdiction do not bar the Aged Hawaiians' claims under § 1983. Nor do any of the other jurisdictional principles asserted by the Appellees preclude determination of the issues raised in this case. Native Hawaiian beneficiaries of the federal-state compact, which is contained in the Hawai'i Admission Act and incorporates HHCA trust obligations, may pursue claims under § 1983 based upon either the asserted violation of rights under these acts or the due process clause of the fourteenth amendment to the United States Constitution. We hold that: (1) the circuit court's order granting summary judgment in favor of the Appellees and dismissing the Aged Hawaiians' § 1983 claims was erroneous because genuine issues of material fact remain to be decided with respect to the Aged Hawaiians' claim that the 1990 lot awards violated their rights under the HHCA; and (2) the Aged Hawaiians are entitled as a matter of law to summary judgment on their claim that the Commission violated their due process rights when it failed to adequately consider their members' acknowledged desire for land sufficient to engage in commercial ranching. Although HHCA beneficiaries on the pastoral wait list are not entitled to "economic units" *per se,* these individuals must be given an opportunity to seek such an award prior to the implementation of a pastoral homestead lot award plan.

Accordingly, we reverse that part of the circuit court's order dismissing the Aged Ha-

waiians' constitutional due process claims under § 1983, vacate that portion of the order concerning their breach of trust claims under § 1983, and remand for further proceedings consistent with this opinion.

---

could serve as a more effective mechanism for obtaining relief than a contested case hearing. 8 Haw.App. at 197–98, 797 P.2d at 67. In the instant case, the Aged Hawaiians made a substantial presentation at the meeting held prior to adoption of the 1990 Plan. Although certain

modifications were made to the previous plan after this meeting, and the Aged Hawaiians obtained the Commission's pledge to provide greater opportunities for aspiring rancher-beneficiaries, *the agency, as yet, has not followed through on its promises.*